## COLIN E. BOOTHBY *vs.* TEXON, INC., & others.[1]

Hampden. November 3, 1992. - March 4, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Contract*, Employment, Performance and breach, Damages, Interference with contractual relationship. *Corporation*, Officers and agents. *Frauds, Statute of. Employment*, Termination. *Damages*, Termination of employment contract, Interest. *Interest. Unlawful Interference.*

At the trial of a claim for breach of an employment contract the plaintiff produced sufficient evidence for the jury to conclude that a corporation's board of directors had authorized the corporation's president to enter into a contract for the plaintiff's permanent employment [476-477], and that the contract was an express contract for his permanent lifetime employment [477-478].

The Statute of Frauds did not bar enforcement of an oral contract for permanent employment, where the contract could have been performed within one year. [478-479]

At the trial of a claim for breach of an employment contract, the judge did not err in instructing the jury that it should use a "reasonable employer" standard in determining whether the employer had a right to terminate the employee for failing to perform satisfactorily [479-481], and there was sufficient evidence to submit the issue of satisfactory performance to the jury [481-482].

At the trial of a claim for breach of an employment contract the plaintiff produced sufficient evidence for the jury to conclude that, at the time of the plaintiff's termination, there was other appropriate work in the defendant's organization of the nature for which the plaintiff had been hired that he could have done. [482-483]

In an action for breach of an employment contract the judge correctly determined that a certain jury instruction proposed by the defendant was not relevant to the facts of the case. [483-484]

In an action for breach of a contract for lifetime employment, the plaintiff presented sufficient evidence to support the jury's finding that he would

---

[1]Thomas Bleasdale, president of the Footwear Industries Group of Emhart Corp., William C. Lichtenfels, executive vice president and a director of Emhart, and A. Peter Clackson, president and chief executive officer of Texon.

incur future damages, that is, damages for the term of the contract beyond the date of trial and ample evidence as to the amount of damages, and the defendant's motion for judgment notwithstanding the verdict was correctly denied. [484-486]

At the trial of a claim of intentional interference with an advantageous relationship, the defendant's motion for a directed verdict was properly granted where the plaintiff's evidence was insufficient to permit a finding that the defendant acted with actual malice in terminating the plaintiff's employment. [486-488]

The judge in a civil action properly denied the plaintiff's motion to amend the judgment to include twelve per cent interest from the date of the breach of contract to the date of the verdict, where the special questions submitted to the jury provided no way to annualize or otherwise make a yearly apportionment of the damages awarded for the purposes of assessing interest. [488]

CIVIL ACTION commenced in the Superior Court Department on October 18, 1984.

After trial before *Lawrence B. Urbano*, J., a motion for a new trial was allowed by him. The case was retried before *William H. Welch*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Mark S. Dichter* of Pennsylvania (*Joseph W. Ambash* with him) for Texon, Inc.

*Charles V. Ryan* (*Joan C. Steiger* with him) for the plaintiff.

ABRAMS, J. The parties have now been through two trials of the same issues.[2] After the first verdict in favor of the plaintiff, Colin E. Boothby, the judge allowed the motion of Texon, Inc. (Texon), for a new trial, determining that the verdict was against the weight of the evidence. At the second trial with a different judge, the jury again awarded Boothby

---

[2]Generally, an order for a new trial is not reviewable until after the new trial is held and a final judgment is entered. See *Allied Chem. Corp.* v. *Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Cf. *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 659-660 & n.8 (1978).

significant damages. Each party has appealed.[3] Texon chal-
lenges, under various theories, the denials in both trials of
motions for judgment notwithstanding the verdict and for a
third trial. Boothby appeals the judge's allowance, in the first
trial, of Texon's motion for a directed verdict on his count of
promissory estoppel and of A. Peter Clackson's motion for a
directed verdict on Boothby's allegation of intentional inter-
ference with an advantageous relationship. Boothby also
claims that the judge in the second trial erred in denying his
motion to amend his order to allow for the addition of inter-
est on the judgment. We granted Texon's application for di-
rect appellate review. We affirm.

Texon appeals from the denials of motions for judgment
notwithstanding the verdict and for new trials. The standard
for reviewing the denial of a motion for judgment notwith-
standing the verdict is "whether 'anywhere in the evidence,
from whatever source derived, any combination of circum-
stances could be found from which a reasonable inference
could be drawn in favor of the plaintiff.' *Poirier* v. *Plymouth*,
374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*,
361 Mass. 341, 343 (1972)." *Dobos* v. *Driscoll*, 404 Mass.
634, 656, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S.
850. (1989). We therefore summarize the evidence in the
light most favorable to the plaintiff.

Colin Boothby, a British citizen, worked for Bata Corpora-
tion for thirty years, beginning when he was sixteen years
old. Bata was the biggest shoe company in the world.
Boothby worked his way up, eventually serving on the per-
sonal staff of the owner and chief executive from 1972 until
1978. In 1978, Boothby became the general manager for
Bata's operation in Thailand where he was in charge of three

---

[3]In its brief, Texon notes, "To simplify this appeal, Texon has focused
on the denial of judgment notwithstanding the verdict in the first
trial. . . ." On the related issues of whether there was just cause for
Boothby's dismissal, and whether a position existed for Boothby after
March 30, 1992 (after the first trial in 1988), Texon has focused exclu-
sively on the second trial. We have adopted this simplification.

factories, one hundred retail stores, twelve distribution depots, and almost three thousand employees.

Texon, headquartered in South Hadley, Massachusetts, manufactured and sold insoles for shoes. Bata was one of its biggest customers, purchasing over two million dollars worth of insoles each year. From 1972 until 1978, Boothby and Lee Asseo, the president of Texon, handled the transactions between the two companies. In the first trial, Boothby testified that he considered Asseo to be "a man of high integrity and honesty." For Boothby, Asseo's "word was his bond."

Because Texon perceived a gap in its senior management, it was interested in recruiting Boothby. Texon had tried to lure Boothby away from Bata in 1976 and again in 1980. In both trials, Asseo said that he discussed the possibility of hiring Boothby with Texon's board of directors at every board meeting from March, 1980, through August, 1981. Dudley Schoales, the chairman of the board, agreed that there were discussions at the board level about hiring Boothby. When asked if the board had authorized Asseo to meet with Boothby, Schoales said, "We sure pressed him to do it." When asked what authority the board gave Asseo, Schoales stated, "I said anything that you can do to get him we ought to do."

Asseo met with Boothby in Bangkok, Thailand, in late January, 1981. Boothby communicated his concerns about leaving Bata to Asseo, noting that the promotional expectations he had made him very happy at Bata. Boothby "wasn't prepared to make any move out of Bata or to even consider making any move out of Bata unless something was going to be attractive, something was going to be a challenge to [him], something was going to be permanent." Boothby said that he informed Asseo that he had "almost one hundred percent job security with Bata due to [his] record, thirty years' service, [his] present position and the need" for senior managers like him. In a follow-up letter, Asseo noted that Texon would be "giving [Boothby] an essentially permanent opportunity to spend the rest of your professional career in the so-called totally civilized side of the world." In response,

Boothby sent a return letter, listing the job security he had at Bata as one of his reasons for being wary of leaving. Both Schoales and Asseo stated that they understood that job security was a priority issue for Boothby and that salary alone would not convince Boothby to join Texon. Boothby stated that he wanted all points to be clarified before he actually accepted any position so there would be no problems later.

Boothby and Asseo met again in South Hadley in July, 1981. Asseo told Boothby that Texon would be merging with Emhart Corporation (Emhart). Boothby testified that he informed Asseo that he was not going to make a move to Texon unless he had "absolute security." He also told Asseo that this point was non-negotiable. Asseo assured him that, should he accept the position, Boothby would spend the rest of his working career at Texon.

As part of the merger, Texon was required to inform Emhart of any employees whose compensation was over $75,000. Boothby's name was not included, on the advice of an attorney, because he had not yet begun work. The attorney suggested that it would be appropriate for Asseo to call the accepted offer of employment to Emhart's attention. Asseo did discuss the accepted offer with Steven R. Ruffi who was the executive vice president of Emhart and who agreed that Boothby's name did not belong on the schedule.

The merger went through and, effective September 4, 1981, the resultant corporation was known as Texon, Inc. Boothby began working at Texon on October 13, 1981. In February, 1983, there was a reorganization in which Asseo became the president of the Footwear Materials Group (FMG). The rest of the footwear concerns were encompassed in the Footwear Industries Group (FIG), headed by Thomas Bleasdale. Boothby's title was vice president/North American operations in FMG.

On August 31, 1983, Asseo resigned as president of FMG and from Texon. Asseo testified that he had worked with Boothby from October, 1981, through August, 1983, and, at the time he left, knew of no valid reasons for firing Boothby. He also had not noted any inadequacies in Boothby's per-

formance. Texon had granted Boothby a series of merit raises.

Asseo said that he had conversations with Ruffi and Bleasdale concerning the naming of his successor. Asseo explained that he had offered the names of George Oks, vice president in charge of European operations, Boothby, and an individual from outside Texon. Bleasdale suggested A. Peter Clackson and William Scanlon, the president of the Shoe Machinery Group. Asseo did not think that the candidates Bleasdale suggested were as appropriate as his own recommendations. Clackson was chosen as Asseo's replacement.

Boothby testified that Mario del Greco, an employee of twenty-five years, was promoted to regional marketing director for the Americas region. On July 10, 1984, Boothby presented del Greco's job description to Clackson. Clackson declared that del Greco's job was a "nothing job" and instructed Boothby to fire him. Boothby declared that this was not proper. They discussed the matter further. Clackson testified that he suggested Boothby demote del Greco to a job below the one from which he had been promoted. Boothby did not want to do this either. In the deposition Clackson said that he then ordered Boothby to fire del Greco. Boothby refused to do so, suggesting that Clackson should do it himself if he felt so strongly about it. Del Greco was not fired. In his deposition, in response to a question, Clackson said: "If I have a manager who reports to me who won't do what he is told, it isn't up to me to do what he should have done, it is up to me to rectify that situation." On August 16, 1984, Clackson called Boothby into his office to notify him that Clackson was reorganizing FMG and that Boothby's job was being eliminated. He was told to leave the next day.

Asseo stated that Texon's informal policy was to terminate employees only for cause and that, before terminating them from the organization, Texon would make efforts to place the employees elsewhere in the company. Emhart had a similar policy. The deposition testimony of Royal Cowles, the vice president for human resources of Emhart Corporation, indicated that he and Clackson did not discuss the possibility of

placing Boothby elsewhere in the organization. Cowles did, however, confirm that Boothby's termination was not a discharge. Cowles explained that Boothby's termination was not for cause, because, in that case, Boothby would not have been eligible for the six months' severance pay he received.

Asseo said that, during his tenure, no manager had ever been fired for failing to achieve the projection of profits indicated in a submitted budget. He also noted that all layers of management would tinker with the budgets, making modifications.

The plaintiff sued the corporation and three of the officers on various theories. During the proceedings, the plaintiff waived his allegation of breach of implied contract. The judge dismissed the plaintiff's allegation of promissory estoppel, granted Bleasdale's motion for summary judgment of the count of intentional interference with an advantageous relationship, and granted Clackson's motion for a directed verdict on the same count at the close of the plaintiff's evidence. Another judge dismissed the plaintiff's allegation of negligence. Special questions were submitted to the jury on the question of the breach of an express contract. The jury in the first trial found that (1) Boothby sustained the burden of proving that Texon entered into a permanent employment contract with Boothby guaranteeing him employment until death or retirement unless earlier terminated for unsatisfactory performance or lack of appropriate work; (2) he sustained the burden of proving that Texon's board of directors either authorized or ratified the action of Asseo in entering the employment contract; (3) Texon failed to sustain the burden of proving that it had justifiable cause for terminating Boothby's employment; and (4) Texon failed to sustain the burden of proving that there was no other appropriate work at Texon for Boothby to undertake at the time of his termination.

That jury also returned a verdict as to damages. The jury awarded Boothby $296,100 plus interest as damages from the date of his termination until the date of trial. It also awarded $3,598,866 for future damages. Texon moved for

judgment notwithstanding the verdict or in the alternative a new trial. On January 30, 1990, the judge denied the motion for judgment notwithstanding the verdict, but allowed the motion for a new trial. He determined that the evidence made it unlikely that Boothby and Asseo entered into an express contract that was to cover nineteen years. Therefore, he found that "the jury verdict in finding the permanent contract proven is so greatly against the weight of the evidence as to induce the belief that it was not the result of a careful consideration of the evidence but was the 'product of bias, misapprehension or prejudice.' *Solimene* v. *B. Grauel & Co.*, [*KG*], 399 Mass. 790, 802 [(1987)]."

On April 26, 1989, Black & Decker Corporation acquired Emhart. Black & Decker sold off the shoe manufacturing business on March 30, 1990. The case proceeded to a second trial on a count for breach of express contract only. Again, the jury were presented with special questions. The judge noted that the jury "found there was an oral express contract for permanent employment under the principle set forth in *Carnig* v. *Carr*, 167 Mass. 544 (1897), that it was authorized by Texon, that Texon, i.e., Emhart did not have justifiable cause to terminate him and there was work of type he was hired to perform available." The jury awarded Boothby $2,146,560.

Boothby moved to amend the order to include provision for interest and costs. The judge denied the motion. Texon moved for judgment notwithstanding the verdict and for a remittitur or a new trial. The judge denied the motions, concluding that "there was evidence on which the jury could find Boothby had an excellent secure job with an international concern, Bata Shoe, that he was one of a small number close to the top, that he had excellent security and pension benefits [and] could have retired at age 60, that he did not want to consider a move unless he was sure the position would be permanent with excellent security, that Texon recruited him strenuously and risked loss of a good customer to get Boothby." The judge continued: "I cannot say there was no basis for the jury's verdict particularly when two juries have

come out with significant verdicts. It appears they felt there was a contract, that Boothby was wrongfully terminated, that there was work he could have done of [the] type [for which] he was hired, that no other meaningful employment was offered, that what he could make from his own employment was substantially below what he would have made or received in pension and retirement benefits if he had not been terminated."

*Texon's Appeal.*

1. *The existence of an enforceable contract for permanent employment.* Both parties discuss *Carnig* v. *Carr*, 167 Mass. 544 (1897), a case where an enameller sold his business to the defendant in exchange for which the defendant agreed to employ the plaintiff permanently. Six months later, the defendant wrongfully and without cause terminated the plaintiff, who sued the defendant. "To ascertain what the parties intended by 'permanent employment,' it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood." *Id.* at 547. In *Carnig* v. *Carr*, we held that "the words would be commonly understood as meaning that, so long as the defendant was engaged in enamelling and had work which the plaintiff could do and desired to do, and so long as the plaintiff was able to do his work satisfactorily, the defendant would employ him, and that in that sense the employment would be permanent." *Id.*

a. *Evidence of authority of Asseo to enter into a lifetime contract.* The defendant, citing *Rydman* v. *Dennison Mfg. Co.*, 373 Mass. 855 (1977), and *Simonelli* v. *Boston Hous. Auth.*, 334 Mass. 438 (1956), states that the appellate courts of Massachusetts have narrowed the holding of *Carnig* v. *Carr*. What these cases actually do is insist that the plaintiff show that the individual with whom he or she entered into a contract for lifetime employment had the authority to do so. For example, in *Rydman* v. *Dennison Mfg. Co.*, we held that the defendant's motion for a directed verdict should have

been allowed because "of the plaintiff's failure to produce evidence from which the jury could find or infer (a) that the personnel director and the engineer had implied or apparent authority to bind the defendant to a fourteen-year contract, or (b) that the defendant had ratified the alleged contract." *Id.* In *Simonelli* v. *Boston Hous. Auth.*, we noted that "[t]here was no evidence that either [the manager] or [the personnel director] had ever made any contracts of permanent employment with any of the employees of the defendant, or that the defendant held them out as possessing such powers, or that it ever knew they or either of them attempted to exercise such powers." *Id.* at 441.

Boothby introduced evidence tending to prove that the board of directors of Texon had given Asseo the authority to bind Texon to a lifetime contract. Asseo said that the board of directors agreed that Texon needed someone with international experience to direct North American operations. He testified that the board members either knew Boothby personally or by reputation. Asseo reported to the board on his negotiations with Boothby and told the board members that it was job security, not salary, that most concerned Boothby. Asseo and Schoales both said that at one board meeting Schoales, chairman of the board of directors, told Asseo to do whatever necessary to get Boothby to leave Bata and join Texon. None of the other directors objected. The evidence presented entitled the jury to find that Texon considered Boothby especially important. The repeated attempts to recruit Boothby, Asseo's initiation of communication regarding Boothby's future, his actual letters to Boothby and his traveling to Bangkok support this characterization. Boothby thus introduced sufficient evidence to allow the jury to find that Texon's board of directors authorized Asseo to enter into a contract for permanent employment. See *Bloomberg* v. *Greylock Broadcasting Co.*, 342 Mass. 542, 549 (1961).

b. *The term of the contract.* Boothby claimed that he entered into a contract for permanent employment. As stated above, what the parties mean when using the term "permanent employment" depends on the specific circumstances.

The judge in the second trial instructed the jury that, under *Carnig* v. *Carr*, the contract for permanent employment meant that Texon would employ him as long as it "continued in the business, [had] work for the plaintiff to do, and as long as the plaintiff [was] satisfactorily able to do it." The judge declined to instruct the jury that it could interpret Asseo's statements regarding permanent employment as words expressing the expectation of a long-term relationship. The defendant objected and cites *Campion* v. *Boston & Me. R.R.*, 269 Mass. 579 (1930), as support for its suggestion that the judge erred in his instructions.

In *Campion* v. *Boston & Me. R.R.*, we held that the "defendant by inviting bids for a 'permanent vacancy' did not agree to employ a man for life or for any definite period of time without regard to his fitness for the position. Notwithstanding the plaintiff was hired to fill a 'permanent vacancy,' he could later be discharged by the defendant at any time it no longer desired his services." *Id.* at 581. That case is distinguishable because the facts and circumstances surrounding the advertisement of the permanent vacancy and the acceptance do not lead to the conclusion that "permanent" meant lifetime but rather to the conclusion that "permanent" meant "not temporary." Boothby testified that he had excellent prospects and substantial benefits at Bata. By accepting employment with Texon, he increased his tax burden and was required to relocate himself and his family to South Hadley, Massachusetts, from Thailand. He repeatedly communicated his concerns about job security to Asseo who in turn expressed them to Texon's board of directors. Boothby argued that, to assuage those concerns, Texon offered him a contract for permanent employment. Boothby thus introduced sufficient evidence to allow the jury to find that he had been offered an express contract for permanent employment. Cf. *O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905 (1993).

c. *The applicability of the Statute of Frauds.* The defendant next argues that, even if a contract existed, the Statute of Frauds would prohibit its enforcement. The defendant

cites *Powers* v. *Boston Cooper Corp.*, 926 F.2d 109 (1st Cir. 1991). In that case, the plaintiff and defendant entered into an oral employment contract under which the "plaintiff, then thirty-two years old, 'was to work for [d]efendant as an outside sales person, year-to-year, until [plaintiff] obtained the age of seventy years.'" *Id.* at 110. The judge held that "an oral contract like this one, lasting until a fixed age more than a year in the future, is . . . proscribed by the statute of frauds. After all, such a contract, though subject to cancellation or defeasance at any time (say, by a party's death), cannot literally be *performed* within the one year statutory period" (emphasis in original). *Id.* Texon argues that this supports its argument that the contract, if it existed at all, should not have been enforced.

The Statute of Frauds "applies only to contracts which by their terms cannot be performed within the year. It does not apply to contracts which may be performed within, although they may also extend beyond, that period." *Doherty* v. *Doherty Ins. Agency, Inc.*, 878 F.2d 546, 551 (1st Cir. 1989), quoting *Rowland* v. *Hackel*, 243 Mass. 160, 162 (1922). Because Boothby's contract was for permanent employment, it could have been performed within one year: Boothby could have died or Texon could have discontinued its business, at which point its obligation to employ Boothby would end. In addition, Texon could have terminated Boothby's employment if he failed to perform satisfactorily. See *Carnig* v. *Carr*, 167 Mass. 544 (1897). The contract between Boothby and Texon thus was enforceable. The judge in the first trial did not err in denying Texon's motions for judgment notwithstanding the verdict and for new trial on the issues of the existence of the contract or the Statute of Frauds. The judge in the second trial did not err in instructing the jury on the definition of permanent employment.

2. *Texon's right to terminate Boothby for failing to perform satisfactorily.* Texon also appeals the denial of its motion for judgment notwithstanding the verdict or for a new trial on the ground that the judge improperly instructed the jury on the question of Texon's right to terminate Boothby

for failing to perform satisfactorily. In *Carnig* v. *Carr, supra* at 547, we stated that "it would be equally unreasonable to hold that the defendant could have intended to bind himself to employ the plaintiff so long as they both lived, regardless . . . of the plaintiff rendering satisfactory service." An employee with a contract for permanent employment can thus be properly terminated if he fails to perform satisfactorily.

Texon asserts that the judge erred in instructing the jury that it should use a reasonable person standard when determining whether Boothby's performance satisfied Texon.[4]

In *G & M Employment Serv., Inc.* v. *Commonwealth*, 358 Mass. 430 (1970), appeal dismissed sub nom. *G & M Employment Serv., Inc.* v. *Department of Labor & Indus.*, 402 U.S. 968 (1971), we stated: "The standard of 'just cause,' however, in the context of a statute regulating employment agencies, would require determination (among other matters) whether there existed (1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the

---

[4]The judge instructed, "So the question you will then have to determine is whether or not the plaintiff did do his work satisfactorily. And on that issue, the standard for that is whether or not a reasonable employer, a reasonable person in the employer's position, would he have been satisfied with the plaintiff's performance. The standard that you have to employ is the standard of a reasonable person.

"And to determine whether or not the defendant was justified in terminating the plaintiff, you would have to be satisfied that there was a reasonable basis for the employer's dissatisfaction with an employee, which was entertained in good faith for reasons such as lack of capacity or diligence, failure to conform to standards of conduct, or other culpable or inappropriate behavior or grounds for discharge reasonably related in the employer's honest judgment to the needs of his business.

"The fact as to whether or not you would have agreed with it is not the test. The fact is whether or not a reasonable employer would have been dissatisfied, and that's what you have to determine is whether or not Texon-Emhart, as a reasonable employer, would they, would a reasonable employer have been satisfied that his performance was or was not adequate?"

needs of his business. Discharge for a 'just cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith." *Id.* at 435. Texon argues that the test is a subjective one and the judge misconstrued the second prong of the *G & M Employment Serv.* test by instructing the jury using a "reasonable employer" standard. We do not agree.

Texon asserts that Massachusetts courts "permit 'substantial scope for the exercise of subjective judgment' where an employee holds a management position." *Goldhor* v. *Hampshire College*, 25 Mass. App. Ct. 716, 723 n.9 (1988). The judge instructed the jury to examine Texon's activities and compare them to a reasonable employer. In *Carnig* v. *Carr*, *supra* at 547, we noted: "The construction contended for by the defendant, namely, that it was for him to say whether he needed the plaintiff's services or not, would put the plaintiff entirely at the defendant's mercy." There was no error.

The question of satisfactory performance is a question of fact for the jury. *Chaplain* v. *Dugas*, 323 Mass. 91, 93 (1948). Texon argues that, even under the reasonable employer standard, it properly terminated Boothby because his performance was not satisfactory and therefore it had just cause. In its brief, Texon proffers two reasons. "Texon's profitability plunged under Boothby's stewardship. . . . Nevertheless, Boothby openly opposed his superior's suggestions that the company improve its profitability by reducing the number of its employees, increasing product prices, and withdrawing a new product that was having quality control problems." Boothby's former supervisors testified that there were morale problems and leadership problems as well. The jury heard the testimony and heard Boothby's attorney cross-examine those supervisors. The jury heard testimony that Boothby did attempt to address the productivity problems. Boothby presented evidence that Texon's recently-adopted early retirement plan and the attrition of those accepting early retirement had some effect on profitability. He also presented evidence that the low morale resulted from Clack-

son's alleged comment that Texon should have fired all the redundant people instead of giving them early retirement.

Texon, in its brief, argues that Boothby's refusal to follow Clackson's order that he fire del Greco was insubordination and thus an additional reason for Texon to terminate Boothby. In *Mansfield* v. *Lang*, 293 Mass. 386 (1936), we held that "one holding a position of responsibility requiring the exercise of power is not bound to as strict adherence to directions of superiors as one in an employment involving the exercise of less responsibility and discretion." *Id.* at 396. Boothby held such a position, so his actions in refusing to fire del Greco may have been excusable. There was no error in submitting to the jury the question whether Boothby was wrongfully terminated.

3. *Was there work for Boothby to do once the footwear materials business was sold?* Texon moved for judgment notwithstanding the verdict and for a new trial on the ground that Boothby did not present sufficient evidence that there was work of the nature for which he was hired that he could have done. Texon asserts that there was not. Black & Decker Corporation purchased Emhart and then sold off the shoe materials business in March, 1990. Texon claims that Boothby was hired because of his expertise in the shoe industry, and that, as a result of Black & Decker's sale of the shoe materials business, Texon was no longer in the business for which Boothby had been hired. Therefore, Texon asserts, any obligation it had to Boothby under a contract for permanent employment would cease. *Carnig* v. *Carr*, *supra* at 547. Boothby argues that he was hired as a manager; that Texon actively recruited him because he had the general management skills Texon needed. He presented evidence that other individuals from the shoe materials business had moved to other areas within the larger Emhart. He also argues that a jury could infer from the size of Black & Decker that there would have been work available for a manager like Boothby.[5]

---

[5]Boothby asserts that the court should focus on whether there was work available at the time of the breach. He suggests that the question should

The jury in the second trial apparently concluded that Boothby was hired as a general manager and had the requisite skills to serve as one. The jury found that there was work available of the type Boothby was hired to perform. There was no error.

4. *The instruction on permanent employment.* Texon argues that it was error for the judge to decline to instruct the jury in accordance with one of their proposed instructions.[6] See *Boleman v. Congdon & Carpenter Co.*, 638 F.2d 2, 3-4 (1st Cir.), cert. denied, 454 U.S. 824 (1981). The instructions on the law of contracts and what must be proved, including the intent of the parties and whether the acts of an officer of a corporation were authorized, were correct. Texon does not argue otherwise. The judge correctly determined that the instruction was not relevant to the facts of this case. In *Boleman*, there were only two conversations regarding lifetime employment, and in one of those the plaintiff was not positive that the employer said it would be a lifetime contract. *Id.* at 3. The plaintiff was much younger and had no experience as an outside salesperson. *Id.* at 4. He moved only from Providence to Worcester. *Id.* Texon did not introduce evidence to counteract Boothby's evidence of a number of conversations between Boothby and Asseo and a number of

---

be "was there work available for the [p]laintiff *on the day Texon broke the contract?*" (emphasis in original). The issue arises because there were two trials. At the time of the first trial, Emhart still operated the shoe materials business, but, by the time of the second trial, Black & Decker, Emhart's successor, had sold off that business. Texon asserts that the sale of the shoe business terminated its obligation to Boothby under a contract for permanent employment. At the time of each trial, however, the juries decided that there was work in the organization that Boothby could have done. We therefore do not discuss the issue.

[6]Texon's proposed instruction read: "In determining the intent of the parties, you should consider whether Mr. Asseo's statements to Mr. Boothby should be interpreted as mere assurances of an employment opportunity with Texon, expected to last into the indefinite future, rather than as a contract of permanent employment for a definite period. You may consider whether Mr. Asseo was rendering friendly advice to Mr. Boothby as to what it was best for Mr. Boothby to do, in other words, hopeful encouragement, sounding only in prophecy, rather than promising permanent employment until retirement or death."

promises made to convince Boothby to leave his secure job with Bata. A judge need not instruct the jury on every spin that a party can put on the facts. *Mericantante* v. *Boston & Maine R.R.*, 291 Mass. 261, 263 (1935).

5. *The calculation of damages.* The jury in the second trial awarded $91,000 to Boothby as damages from the date that Black & Decker sold the shoe business, March 30, 1990, to the date of the verdict and $1,096,500 in future damages.[7] Texon moved for judgment notwithstanding the verdict because it claimed "there was insufficient evidence to support a finding that [p]laintiff will incur any recoverable damages in the future" and that "an award of front pay in this case is too uncertain, contingent or speculative to be susceptible of trustworthy proof."

Texon argues that there was "no factual basis upon which the jury could have based any award of damages after March 30, 1990. There was no evidence of any salaries or bonuses paid to allegedly comparable employees at Texon, Emhart, or Black & Decker from March 30, 1990, until the date of trial, and Boothby did not identify any position at Black & Decker for which he claims to have been qualified after the footwear materials business was sold." This, Texon claims, shows that the jury based its award on impermissible conjecture, surmise, and speculation. Texon also claims that Boothby introduced no evidence tending to prove that Black & Decker had a management incentive program, how bonuses, if any, would be computed, or the value or replacement costs of his lost fringe and pension benefits. Finally, Texon argues that the jury's valuation of pension benefits was pure guesswork absent expert testimony.

The judge determined: "The jury heard considerable evidence as to Boothby's pay, his bonuses, the pay of other executives in Texon and Emhart, their bonuses, the additional retirement benefits which were considerable and valuable, the retirement benefits he gave up at Bata, the fringe benefits

---

[7]Texon has not appealed the jury's awards of damages from the date of termination to March 30, 1990.

at Texon in the way of life insurance and health insurance. Relatively few questions were asked of Mr. Boothby as to what efforts he made to find other employment. There was evidence there were very few opportunities in the shoe manufacturing or wholesaling business in the northeast. As a result, Boothby set up a business of his own marketing insoles as an independent marketing representative through a company known as Copex. There was considerable evidence as to what his gross or net income was from this and whether he had prudently managed it. The burden of proof to prove mitigation was on the defendant. There was evidence the plaintiff's compensation alone apart from fringe benefits, pension benefits and opportunities for further advancement was $138,000.00."

In *Cutter* v. *Gillette*, 163 Mass. 95 (1895), we noted: "The plaintiff's cause of action accrued when he was wrongfully discharged. . . . In estimating his damages the jury have the right to consider the wages which he would have earned under the contract, the probability whether his life and that of the defendant would continue to the end of the contact period, whether the plaintiff's working ability would continue, and any other uncertainties growing out of the terms of the contract, as well as the likelihood that the plaintiff would be able to earn money in other work during the time. But it is not the law that damages which may be larger or smaller because of such uncertainties are not recoverable." *Id.* at 97. Therefore, the law in Massachusetts comports with the law in the majority of jurisdictions allowing a wrongfully discharged employee to recover damages for the term of the contract beyond the date of trial. See *Sullivan* v. *David City Bank*, 181 Neb. 395, 397 (1967) ("employee may recover his full damages even where the action is tried before the expiration of the term of the employment"); *Granow* v. *Adler*, 24 Ariz. 53, 60 (1922) (employee "entitled to a verdict in such sum as would compensate him for the injuries sustained not only to the day of trial but to the end of the contract period"). See also J.C. McCarthy, Recovery of Damages for Wrongful Discharge § 3.92 (2d ed. 1990) ("vast majority of

jurisdictions considering this question have held that the employee may" recover damages for the unexpired term).

In *Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877 (1982), we affirmed the judge's decision not to allow the jury "to consider the issue of damages for lost wages and fringe benefits." *Id.* at 884. That case is distinguishable because the employee was an at-will employee. We noted that we did "not believe that an employee should be entitled to benefits which he neither contemplated nor included in his contract." *Id.* Boothby, however, did contemplate fringe benefits such as pension rights. He presented evidence of his salary, his salary history, his reviews and promotion expectations, his bonuses and his pension rights at the time of the breach. Boothby presented evidence of the salaries of other managers and their bonuses and advancement opportunities. He testified as to the compensation he received working independently. There was sufficient evidence for the jury to award damages to Boothby for breach of his contract for permanent employment.

The judge instructed the jury that "whatever you determine he's entitled to for prospective damages, future damages, should be reduced to its present economic value." The judge told the jury that "using its common sense and its understanding and its knowledge of mathematics, may, without the aid of any experts, determine the value, the present economic value of prospective or future earnings." There was ample evidence as to damages. There was no error.

*Boothby's Cross-appeal.*[8]

1. *Boothby's allegation of intentional interference with an advantageous relationship.* Boothby claimed that Clackson intentionally interfered with Boothby's relationship with Texon. Clackson moved for a directed verdict, which the judge granted. Boothby appeals.

---

[8]The judge in the first trial allowed Texon's motion for directed verdict on the promissory estoppel count. The judge said the situation between Boothby and Texon did not illustrate a situation where consideration was lacking and reliance took its place. We need not discuss the issue given our decision to affirm the jury's finding that a contract existed.

"It is axiomatic that, in reviewing the denial of the defendant's motions for directed verdict and judgment notwithstanding the verdict we will construe the evidence most favorably to the plaintiff and disregard that favorable to the defendant." *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982).

In *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981), we addressed the issue of an employee claiming a supervisor intentionally interfered with the employee's advantageous relationship with the employer. We noted that an employee's supervisor is "privileged to act as he did unless he acted out of malevolence, that is, with 'actual' malice." *Id.* at 663. We have also said that malevolence is " 'for a spiteful, malignant purpose, unrelated to the legitimate corporate interest.' *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987)." *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992). Thus, Boothby was required to prove that Clackson's actions were unrelated to any legitimate corporate interest. In *Gram* v. *Liberty Mut. Ins. Co., supra* at 664, we continued, "The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence." *Id.* We also noted that "the inference, assuming it to be reasonable, that [the supervisors] did not like [the employee] would not alone reasonably warrant a further inference that it was probable that [the supervisors] acted with ill will to obtain [the employee's] discharge." *Id.* The supervisors in *Gram* v. *Liberty Mut. Ins. Co.* thought the employee had broken a company rule and that was their reason for firing him. *Id.* at 665.

Boothby's evidence tended to prove that Clackson was angry because Boothby refused to fire del Greco. See *supra* at 473. Boothby's evidence was that Clackson had poor "people skills" and had engendered low morale by stating that the older workers should have been fired instead of being offered early retirement. The judge ruled that Boothby's evidence as

to Clackson's personal traits was insufficient to prove that Clackson acted with actual malice.[9] There was no error.

2. *Boothby's request for the addition of interest.* Boothby moved that the judgment be amended to include interest of twelve per cent from the date of the breach to the date of the verdict. The judge denied the motion, ruling that it would present a windfall to the plaintiff. On appeal, Boothby requests that we "set forth a method that fairly recognizes the substantial losses of use of money to him in this matter and compensates Boothby fully for the loss of the money." Texon violated the contract in 1984. The second jury rendered the verdict in 1991. The jury did not receive a special interrogatory requesting that it award damages on an annual basis. In his memorandum and order, the judge determined that the plaintiff could have requested such a question and that Texon did suggest it. In these circumstances, Boothby cannot complain of the judge's decision not to include interest. In the absence of damages on an annual basis or some other breakdown of the jury's verdict, there is no way to assess interest. There was no error.

*Judgment affirmed.*

---

[9]Boothby asserts that the judge should have considered Clackson's comment that it was up to Clackson "to rectify the situation." Boothby claims that statement "speaks volumes." The statement, however, was not made at the time Boothby was terminated, but in response to a question during a deposition in October, 1985. The judge could consider that the statement was made to justify Boothby's termination and did not relate to actual malice at the time of the termination.