Billings, A.J.
The plaintiff, who was employed by the corporate defendant (“NEBS” and supervised by the individual defendant (“Hamois”), alleges that her difficulties in, and eventual termination from, her employment were the result of discrimination on the basis of handicap (Count I) and/or gender (Count II), and that Hamois wrongfully interfered with her contractual and/or advantageous relations with NEBS (Count III). The defendants have moved for summary judgment, asserting (a) that the plaintiff was not substantially limited in any major life activiiy and thus was not a qualified handicapped individual; (b) that she was terminated for legitimate, nondiscriminatory reasons; and (c) that Harnois’ role in her termination was not improper in means or motive, and in any event is subject to the exclusivity provisions of Chapter 151B.
For the following reasons, the defendants’ Motion for Summary Judgment is ALLOWED.
FACTS
The record establishes the following facts, which are either undisputed or viewed in the light most favorable to the plaintiff. The plaintiff suffers from fibromyalgia, a musculoskeletal disorder[1] which causes her pain if she sits for prolonged periods, and frequently causes her to lose sleep. Both the pain and the sleeplessness were variable: while the plaintiff was working at NEBS, she had flare-ups during which she could not sit for longer than an hour at a time, and nights when she slept only one to five hours. Matters appear to have improved somewhat beginning in January 1999; from then, until her termination in September, she was sleeping five to six hours a night.
*558 The plaintiff began work for NEBS on June 2, 1997 as a Senior Corporate Auditor. Initially, she reported to James Nethercut, the department’s only other employee, with whom things appeared to go smoothly. In May 1998, however, Nethercut was promoted and no longer supervised the plaintiff (who, as the department’s sole remaining employee, took over running it for awhile).
In August 1998, Hamois was hired as the new Director of Internal Audit and became the plaintiffs supervisor in what remained, for a time, a two-person department. Two other employees (David Nash and Don Foley) were hired shortly thereafter, performing different functions from the plaintiffs within the Internal Audit Department.
On October 20, 1998 the plaintiff informed Hamois that she had been diagnosed with fibromyalgia, and that it was causing her back pain, eye problems, and sleeplessness, which had caused most of her recent absences from work. NEBS never denied the plaintiff time off to go to a medical appointment, but Hamois did ask that the plaintiff schedule these outside working hours whenever possible.
On January. 8, 1999 Hamois gave the plaintiff a formal warning concerning her “excessive number of absences” (seventeen days in the preceding seven months, “excluding vacations and workers’ comp”). The memorandum advised the plaintiff that “[flmmediate and continued improvement in your attendance record is required,” and that further absences might result in a final written warning and possible subsequent dismissal.
On February 18, 1999 the plaintiff requested and received a meeting with Harnois, in the latter’s office, concerning a question she had about how to interpret a computer report. Harnois was impatient and snappish. The two argued over the approach Hamois was taking to the plaintiffs question. “At the conclusion of his outburst,” the plaintiff recalled in a February 25 memo (see below), “I looked at him, and did, in fact, tell him that he was obnoxious.” The discussion did not touch on the plaintiffs health problems or absenteeism. The meeting ended in a race to the Human Resources office to make the first report. Harnois got there first, and spoke with HR’s Ellen McGowan; when he came back, the plaintiff went and also spoke to McGowan.
At a meeting the next day among the plaintiff, Hamois, and McGowan, the plaintiff was issued a Final Warning, authored by Harnois and notifying her that she was now at risk of termination for her “absolutely unacceptable” comment in calling him “obnoxious.” There was an extended discussion (marked by predictable disagreement) concerning the plaintiffs performance. The plaintiff wrote a lengthy memo, titled “Rebuttal to Final Warning” and addressed to her own personnel file, on February 25.
In April or May 1999, McGowan called the plaintiff to a meeting in her office, at which McGowan suggested the plaintiff apply for an intermittent leave under the Family and Medical Leave Act. In fact, the plaintiff had already received and completed an application on January 26, 1999, but was reluctant to submit it (FMLA leave is unpaid, and the plaintiff was “hopeful that I wouldn’t have to do this”). Finally, on June 2, 1999 — the second day of a three-day absence — she did submit the application, and was accordingly granted leave for June 2 and June 3.[2]
When she returned on June 4, the plaintiff received her annual evaluation from Hamois. The “Overall Rating” was “Performance meets expectations at times.” In addition to noting that the plaintiffs “attendance record continued to be of concern” in the year since her previous review, Hamois criticized various aspects of her work, particularly time management and timely completion of projects, written communications skills, and interpersonal relations. On the last point, Harnois perceived difficulties in the plaintiffs dealings with internal clients, who reported her to be “rigid and inflexible,” and also mentioned “disruptive” behavior, including the “disrespectful and unprofessional” comments to him in February. The report noted improvement in this area, however, and complimented several other aspects of the plaintiffs work.
The plaintiff wrote a four-page, single-spaced memo on June 11 to Harnois’ supervisor (NEBS’s CFO Dan Junius), airing her grievances both about the evaluation and about Hamois’ management of her. In addition to an extended discussion of the difficulties in her interpersonal relations with him, and what she perceived as the causes — intensity, rigidity, and stress on Hamois’ part — she “acknowledge^] that I have been absent an unusually high number of times in the past year.” She also noted her recent submission of her FMILA intermittent leave application, and observed,
Now that I have done this, eveiything is fine, according to [Hamois], because we are “following the letter of the law.” That is the only thing that is of any importance to him; that a law, or rule is being followed and there can never be any deviation from this. If there are eight weeks scheduled for an audit, absolutely nothing unexpected or unforeseeable makes any difference in staying within that schedule.
The plaintiff met with Junius on June 14 and mentioned, among other things, her view that Harnois had exaggerated the number of her absences, to which Junius responded that he was not going to get involved in the management of the audit department.
The plaintiff on August 4, 1999 wrote another lengthy (6 pages, single-spaced) memo to her own personnel file — an expanded version of her June 11 memo. As before, she was critical of Hamois and defensive of her own performance. “I really like Al,” she added, notwithstanding his “obsessive/compulsive” *559 behavior, its “disruptive” effects on the department and herself and what she had recently come to believe was his “difficulty in working with women.”
The plaintiff provided a copy of her August 4 memo to McGowan but not to Harnois. Several weeks later, however, Seth Canter (NEBS’s Director of Human Resources) provided Harnois with a copy on August 23. The situation deteriorated rapidly from this point forward. On August 25, Harnois requested by e-mail that a member of the HR department be present at future meetings between the plaintiff and himself to overcome what he described as the “ ‘he said, she said’ syndrome.”
The following day, such a meeting occurred, attended by the plaintiff, Harnois, and HR’s McGowan, to discuss how the plaintiffs recent four-day absence for a relative’s funeral (see note 2, supra) would be treated (as a paid absence, unpaid leave, vacation, etc.). The parties also discussed the plaintiffs absenteeism in general. Harnois’ memo of the meeting notes “that no FMLA days have been recorded as absences,” and that while the plaintiff stated “that we were holding her illness against her,” McGowan stated this was not the case. Harnois’ memo also records his impression that the plaintiff was testy throughout the meeting, “veiy unprofessional,” “agitated,” “loud,” and “sarcastic.”
On September 1, 1999 Harnois submitted a memo responding to the plaintiffs of August 4, shared with him on the 23rd. In his response, he took umbrage at what he saw as “unprofessional, irrelevant and often false . . . defamatory, . . . inaccurate, and unwarranted” statements in the plaintiffs memo.
The denouement occurred at mid-month. On September 10, the plaintiff left Harnois a memorandum regarding an audit program to which she had been assigned, with a request that they speak about it. On the 14th, Harnois left her a typed response, with a handwritten note informing her that some of the issues in it would be discussed at a meeting the next morning. The plaintiff found these when she arrived the next morning. Upset at this perceived rebuff of her request for an in-person conference, she went to Harnois’ office and told him, “Al, I cannot do this anymore. I need to be able to talk to you in person.”[3] When Harnois interrupted her, she asked, “Would you please let me finish?” He responded by saying they needed to discuss her attitude and behavior, a remark the plaintiff recalls as having been delivered on both feet, with raised voice and wagging finger.
The plaintiff left Harnois’ office and took her case to McGowan’s (this time, arriving there before Harnois). After hearing what she had to say (that Harnois would not talk to her, but that his two male reports were granted frequent audiences), McGowan asked for copies of the relevant notes and memos and said she would talk to Harnois.
Harnois and McGowan met soon afterward. The former, calling the plaintiffs conduct inappropriate and insubordinate and noting that she was already on “Final Warning” status, now recommended that she be terminated. This required, however, the approvals of Junius and Canter. They suspended the plaintiff, pending investigation by McGowan into whether she should be terminated.
Harnois and McGowan delivered this news to the plaintiff in McGowan’s office, with McGowan requesting that the plaintiff provide her side of the stoxy in writing. When McGowan suggested that Harnois read aloud his “Record of Discussion” pertaining to the morning’s incident in his office, the plaintiff rose and terminated the meeting, stating that Harnois was lying about what had happened and that her illness was the source of her difficulties with him.
As she was walking the plaintiff out of the building, McGowan asked her who else she should speak with as part of the investigation. The plaintiff provided the names of two female coworkers to whom she had expressed frustration over Harnois’ treatment of her. As soon as she got home, the plaintiff turned to the written statement McGowan had requested. She completed it in half an hour, and e-mailed it to McGowan.
The plaintiff left a voice-mail for McGowan on September 20, this time supplying the names of three male co-workers who, she said, had also been mistreated by Harnois. The following day she left McGowan another voice-mail, stating that she had no more information to provide in connection with the investigation.
McGowan interviewed all five witnesses identified by the plaintiff. She then reported to Canter that she had found no witnesses who supported the plaintiffs version or contradicted Harnois’ version[4] of the events of September 15, and nothing that warranted further investigation. Canter and Junius therefore approved Harnois’ recommendation, and on September 22, 1999 NEBS terminated the plaintiffs employment. Its notice to her (over Harnois’ signature) gave as the reason for the termination
that your behavior on September 15... was insubordinate and inappropriate, and in direct conflict with the expectations outlined in a final written warning for unprofessional behavior which you had received on February 9, 1999.
After the plaintiffs termination her position was filled, on Harnois’ recommendation, with a female hire named Brenda Talbot.
DISCUSSION
A. Discrimination Based on Handicap (Count I)
G.L.c. 151B, §4(16), provides that it shall be an unlawful practice
[f]or any employer ... to dismiss from employment or refuse to hire or otherwise discriminate against, because of his handicap, any person alleging to be *560 a qualified handicapped person, capable of performing the essential' functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer’s business.
A “handicapped” employee is one who has a “handicap,” which the statute defines as
(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment.
G.L.c. 151B, §§1(17), 1(19).
There was no direct evidence that the plaintiff was terminated, wholly or in part, because of her fibromyalgia. The plaintiff relies instead on circumstantial evidence, to which the familiar three-stage order of proof from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies, at least for summary judgment purposes.[5] First, the plaintiff must make out a prima facie case; that is, she
must present credible evidence that (1) [s]he is handicapped within the meaning of the statute; (2) [s]he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) [s]he was terminated or otherwise subject to an adverse action by (her) employer; and (4) the position he had occupied remained open and the employer sought to fill it.
Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 2 (1998). Then,
[o]nce the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate reason for its actions. Thereafter, the burden shifts back to the employee to show that the employer’s asserted reason was not the true reason, but rather a pretext.
Handrahan v. RedRooflnns, Inc., 43 Mass.App.Ct. 13, 14-15 (1997).
If there is evidence warranting a finding of pretext, then the case goes to the fact finder for determination of the “bottom line” question: was the adverse job action in question motivated by discriminatory animus — here, was the employee terminated “because of [her] handicap” — or not.
The burden of persuasion remains with the employee at all times. The employee must prove by a preponderance of the evidence that the asserted lawful reason was not the real reason for the termination.
Tate v. Department of Mental Health, 419 Mass. 556, 362 (1995).
The defendants first argue that the plaintiffs’ fibromyalgia was not a “handicap” under the statute, because it did not limit her in one or more major life activities. They point to such evidence as the fact that after she was terminated, the plaintiff worked at renovating rental properties, and that she has not told her current employer (for whom she works as a property manager) that she suffers from fibromyalgia. The plaintiff responds that her condition interfered with her ability to work arid to sleep; that these are both major life activities; and that she was indeed “handicapped” within the meaning of the statute.
For present purposes, I need not rule whether the plaintiff was “handicapped” as the statute uses the term, because even assuming the plaintiff has made out a prima facie case (which, if she was handicapped, she has done), the defendants have articulated a legitimate, nondiscriminatoiy reason for her termination: her “insubordinate,” “inappropriate,” and “unprofessional” behavior in Hamois’ office on September 15, 1998. The burden then shifts back to the plaintiff to produce a triable issue as to pretext.
This, she has not done. Accepting in toto the plaintiffs account of the September 15 encounter with Hamois and all that led up to it, it is manifestly clear that she and her supervisor had a poor, even dysfunctional, working relationship; that she was already on Final Warning status due to the February incident in which she had called him “obnoxious”; and that her conduct seven months later was of precisely the sort that she had been warned could lead to her termination. There was, in other words, a consistency and an internal logic to NEBS’s action in suspending and then terminating her following, and because of, the September 15 encounter, and those actions are entirely explainable without animus based on handicap.
The evidence does suggest that the plaintiffs frequent absences from work for medical appointments and other reasons had been a source of friction with Hamois. When she finally applied for FMLA leave in June 1999, however, it was granted the same day. By the plaintiffs own account this appeared to satisfy Hamois’ desire to “follow[ ] the letter of the law.” NEBS granted single-day FMLA leaves on the two occasions thereafter that the plaintiff requested them. Nothing in the record suggests that NEBS failed at any time to grant reasonable accommodation for her illness, or that any issue traceable to the plaintiffs fibromyalgia impacted her employment status adversely (beyond the obvious fact that her FMLA leave was unpaid).
Nor are any of the familiar indicia of pretext present in this record. The plaintiff has not shown, for example, that others not in the protected class were treated more favorably than she, see Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997) (differential treatment of similarly situated employees outside the protected class is “the most probative means of establishing . . . pretext”), or that NEBS’s articulated reason for its termination decision was marred by “weaknesses, implausibilities, inconsistencies, in-coherencies, or contradictions,” see City of Salem v. *561 Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. 627, 642 (1998), or that the decision itself was marked by “uncontrolled subjectivity.” Id.
“The employer does not have to persuade the trier of fact that it was correct in its belief’ that the employee’s behavior was insubordinate; its “reasons for its decision to terminate ‘may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail.’ ” Tate v. Department of Mental Health, 419 Mass. 556, 363 (1995), quoting Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 766 (1986). The plaintiff and Harnois plainly were not a match made in heaven, as one suspects both would acknowledge. It may be that not all supervisors would have had the sensitivities and the interpersonal difficulties with the plaintiff that Harnois had, and perhaps not every employer would have terminated her for the conduct she committed. She has not, however, produced competent evidence that the asserted reason for her termination was pretextual, or that the real reason was discrimination based on handicap. Summary judgment will therefore enter, dismissing Count I.
B. Discrimination Based on Gender (Count II)
What has been said concerning Count I disposes of Count II as well. As on the handicap claim, there was no direct evidence of discriminatory animus based on gender;[6] the plaintiffs prima facie case was met with the defendants’ articulation of a legitimate, nondiscriminatory reason for her suspension and termination; and she did not show the reason to have been pretextual.[7] Summary judgment will therefore enter dismissing Count II.
C. Intentional Interference by Harnois (Count HI)
Count HI is subject to what are, by now, familiar requirements in the context of employees’ claims against their supervisors:
In an action for intentional interference with advantageous relations, an employee must prove that (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant’s actions. Where, as here, the claim is asserted against an individual official of the employer, the plaintiff is required to show, as to “improper motive or means,” that the “controUing factor” in the alleged interference was “actual” maHce; “implied” malice is not sufficient. [The] requisite “malice” in this context [is] “a spiteful, malignant purpose, unrelated to the legitimate corporate interest” of the employer.
Weber v. Community Teamwork, Inc., 434 Mass. 761, 781-82 (2001), quoting Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 664 (1981), and Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993).
Harnois argues for dismissal of Count III on two grounds: that the claim is preempted by Chapter 15 IB, and that the evidence does not make out a prima facie case in any event, because the plaintiff has not shown that Harnois’ conduct toward her was improper in motive or means.
The preemption argument is misplaced. The SJC has been clear that Chapter 15 IB is not to be
view[ed] ... as tending to narrow or eliminate a person’s common law rights where applicable. The statute broadens existing remedies rather than requiring resort to it as exclusive of all other remedies.
Comey v. Hill, 387 Mass. 11, 20, 438 N.E.2d 811 (1982) (rejecting argument that Chapter 15 IB preempted claim for intentional interference with advantageous relationship); accord, Weber, 434 Mass. at 781 n.41; Charland v. Muzi Motors, Inc., 417 Mass. 580, 586 (1994) (“where applicable, G.L.c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law"; emphasis supplied). Even if Chapter 15 IB provided the sole remedy for gender and handicap discrimination, moreover, Count III can fairly be read as pleading, in the alternative to Counts II and III, that Harnois persecuted the plaintiff out of simple, gender- and handicap-neutral spite or malevolence. This would satisfy the “improper motive” requirement for the common-law tort. See Alba v. Sampson, 44 Mass.App.Ct 311, 315 (1998), and cases cited.
The record before me does not, however, support an inference of improper motive.
To be reasonable, an inference of malice must be based upon probabilities rather than mere possibilities. An employee must demonstrate that spite or malevolence, i.e., a purpose unrelated to any legitimate corporate interest, was the controlling factor in urging the plaintiffs discharge . . . An inference that a defendant did not like the plaintiff... would not warrant the further inference that the defendant probably acted with ill will in securing the plaintiffs discharge.
Id. at 315-16, citing Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 664 (1981), and Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993). See also Weber, 434 Mass. at 783 (“evidence that a corporate official engaged in ‘sloppy and unfair business practices’ is an insufficient basis to negate the official’s broad privilege to terminate an at-will employee. [The manager’s] behavior must rise to the level of personal hostility or ill-will to satisfy the malice standard.”). While the record amply documents the poor chemistry between two individuals who unfortunately found themselves to *562 gether in a small department, it does not approach a showing of malice.
Nor has the plaintiff produced evidence of improper means. Although she argues in her brief that Harnois “lied about her conduct to NEBS to get her fired,” examination of her deposition testimony on the point reveals that the “lies” in question were statements of opinion by Harnois on such issues as the quality of the plaintiffs communication skills, her other skills, and her job performance. Rendering qualitative evaluations of an employee’s performance is not “lying,” and not “improper means,” even if the employee disagrees with the supervisor’s assessments of her. Summary judgment will therefore enter on Count III as well.
CONCLUSION
For the foregoing reasons, summary judgment will enter for the defendants, dismissing all three counts of the Complaint.

There is evidently some controversy in the medical community concerning whether fibromyalgia is ever a legitimate diagnosis. For purposes of this motion, I accept that it is, and that the plaintiff was legitimately diagnosed with it.

In the three and one-half months that she remained employed by NEBS, it appears that the plaintiff took just two FMIA leave days, but was also absent for three vacation days; one sick day (“poison ivy”); five additional hours of sick leave (one early departure “to get medication” and two for dentist appointments); and four days to travel to the funeral of her husband’s grandmother. The last evidently caused some friction because the plaintiff failed to obtain advance permission for the absence.

The parties’ recollections as to who said precisely what at this meeting, and who interrupted whom, differ somewhat, but not greatly; recounted here is the plaintiffs version.

The two versions, as reduced to writing by the plaintiff and by Harnois, differed in essentially insignificant details. Both described a heated exchange concerning the fact that Harnois had responded to the plaintiffs memo in writing rather than in person. Harnois recalled that the plaintiff opened the meeting by saying, “I don’t want to do this”; the plaintiff, that she began with “Al, can I talk with you? I can’t do this anymore; I need to be able to discuss things with you rather than having to communicate by e-mail and memos.” The plaintiff described Harnois leaving his chair, raising his voice, and shaking his finger at her; Harnois’ account omits these details. The differences are both predictable and immaterial, but for present purposes, I have accepted the plaintiffs version in all particulars.

See generally Lipchitz v. Raytheon Co., 434 Mass. 493, 508 (2001), for a discussion of the differences between summary judgment analysis and proper instruction of the jury in employment discrimination cases.

“Direct evidence in this context is evidence that ‘if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.’ ” Wynn & Wynn, P.C. v. Massachusetts Comm’n Against Discrimination, 431 Mass. 655, 667 (2000), quoting Johansen v. NCR Comten, Inc., 30 Mass.App.Ct. 294, 300 (1991). The plaintiff did testify to a comment by Harnois that he had had difficulty working with a particular employee in a previous job (whom the plaintiff knew to be female because Harnois used the feminine pronoun), and a second comment that an operator on an international call, also female, was a “flake.” The plaintiff did not attribute to Harnois any epithets or other words indicative of gender bias, did not know either individual he remarked about, and was not present for the events leading up to either comment. She does not appear, in her brief, to maintain that either comment constituted direct evidence of discriminatory animus, and clearly, neither did.

Noteworthy as well is the fact that during the period of her suspension, the plaintiff gave McGowan (the investigator) fivé names of witnesses, three whom she identified as male employees whom Harnois had mistreated. This might have bolstered her critique of Harnois’ management style, but it did little for her case of disparate treatment based on gender. The additional fact that the plaintiffs position was filled with another female, while it did not defeat her prima facie case, see Wynn & Wynn, P.C. v. Massachusetts Comm’n Against Discrimination, 431 Mass. 655, 665 n.22 (2000), was similarly unhelpful to her in the overall picture.