# United States Court of Appeals
## For the First Circuit

Nos. 08-2026, 09-1597, 09-1603, 09-1731

SAGUN TULI,

Plaintiff, Appellee/Cross-Appellant,

v.

BRIGHAM & WOMEN'S HOSPITAL;
ARTHUR DAY, M.D.,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

John P. Ryan with whom Myles W. McDonough, John A. Donovan, III, Nicholas W. Schieffelin and Sloane & Walsh, LLP were on brief for defendant, appellant/cross-appellee Arthur Day, M.D.
Robert R. Hamel, Jr. with whom John J. Reardon, Matthew Grygorcewicz and Melick, Porter & Shea, LLP were on brief for defendant, appellant/cross-appellee Brigham & Women's Hospital, Inc.
Michael S. Bonner and Gregory J. Aceto with whom Johnson & Aceto, LLP was on brief for plaintiff, appellee/cross-appellant.

August 29, 2011

**BOUDIN**, <u>Circuit Judge</u>.  Now before us are four appeals in a case brought by Dr. Sagun Tuli, a female neurosurgeon, against her employer Brigham and Women's Hospital ("the Hospital") and her former co-worker and supervisor Dr. Arthur Day.  The first appeal was by the Hospital from a preliminary injunction sought and obtained by Tuli; the three more recent appeals followed a jury verdict awarding Tuli damages against the defendants and a permanent injunction crafted by the district judge.

In 2002, the Hospital hired Tuli as an associate surgeon in the Department of Neurosurgery and Day as residency director and vice chairman of the department.  In 2002 and 2003, Tuli was made the department's professionalism officer and representative to the Hospital's Quality Assurance and Risk Management Committee ("QARM"), which required her to investigate and in some cases report on other doctors' case complications.  In 2004, the departure of two colleagues left Tuli as the sole spine surgeon; she says that, unlike prior male doctors, she was not promoted to the position of Director of Spine.

Most of Tuli's claims stem from her interactions with Day, who became her supervisor when he was promoted to chair the department in 2007.  As QARM representative, Tuli was asked to investigate three of Day's cases, which ultimately were reported to the state's Board of Registration of Medicine.  Tuli alleged that Day's behavior toward women has been consistently inappropriate and

demeaning.  Starting in 2005 and continuing until 2007, Tuli began to bring her concerns about Day to Dr. Anthony Whittemore, the chief medical officer of the Hospital.

Tuli herself exchanged cross-charges with a resident in 2005.  He accused her of threatening his job after he told Day that she was upset by Day's decision to operate on one of her patients against her wishes; Tuli accused the resident of mismanaging one of her patients by failing to check blood work, leading to a complication requiring urgent care.  Tuli also received a number of patient complaints in 2006 and 2007, primarily concerning her attitude and communication skills.

Tuli's medical staff credentials were due for review by the Hospital's credentials committee in October 2007.  Day presented Tuli's case to the committee, stating that she had mood swings, that twenty to thirty members of the operating room staff did not want to work with her, and that she would benefit from anger management training.  The committee then conditioned Tuli's reappointment on obtaining an evaluation within four months by an outside agency called Physician Health Services ("PHS") and agreeing to comply with its recommendations.

After concerns were raised about the lack of specificity of Day's presentation, the committee had Whittemore re-present Tuli's case at a December 2007 meeting; Whittemore provided a somewhat more balanced opinion, but mostly rehashed the issues Day

-3-

had discussed during the earlier meeting and did not tell the committee of Tuli's prior complaints against Day. The committee affirmed its earlier decision. Near the end of December, Tuli filed the present lawsuit and sought a preliminary injunction to prevent loss of her privileges during the pendency of the case.

Under both federal and state law, Tuli's complaint charged the Hospital and Day with gender discrimination through both disparate treatment and a hostile work environment,[1] retaliation,[2] and violation of Massachusetts' Health Care Whistleblower Act.[3] It also charged the Hospital with equal pay violations under both federal and state law[4] and Day with intentional interference with advantageous relations and slander.

The district court granted the preliminary injunction, which the Hospital appealed; shortly thereafter the trial resulted in a jury decision favorable to Tuli in most respects, which then led to a permanent injunction. This court then deferred action on the original appeal, anticipating that it would be mooted by the superceding permanent injunction. When the Hospital said that

---

[1]Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e to e-17 (2006); Mass. Gen. Laws ch. 151B, § 4(1) (2011).

[2]Title VII, 42 U.S.C. § 2000e-3 (2006); Mass. Gen. Laws ch. 151B, § 4(4) (2011).

[3]Mass. Gen. Laws ch. 149, § 187(b) (2011).

[4]Equal Pay Act of 1963, 29 U.S.C. §§ 201-19 (2006); Mass. Gen. Laws ch. 149, § 105A (2011).

attorneys' fees might be affected by the resolution of the appeal on the original injunction, we instead consolidated the old appeal with the new appeal from the final judgment.

The jury awarded Tuli $600,000 against the Hospital in compensatory damages on the retaliation claim; $1,000,000 in compensatory damages against it on the hostile work environment claim; $20,000 in damages against Day for economic harm on the interference claim; and nominal damages for the whistleblower claim against the Hospital, the slander claim against Day, and non-economic harm from the interference claim against Day. Tuli lost her discriminatory disparate treatment and unequal pay claims. Both sides have now appealed from the final judgment.

Hostile work environment. In contesting the award on the hostile work environment claim, the Hospital makes four different arguments. We begin with the contention that the claim failed as a matter of law. Our review on such issues is de novo, but the evidence is taken in the light most favorable to the verdict. Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 170 (1st Cir.), cert. denied, 130 S. Ct. 362 (2009).

To prevail on such a claim based on gender discrimination, Tuli had to offer evidence to show that

> (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon gender; (4) the harassment was sufficiently severe or

pervasive that it altered the conditions of her employment and created an abusive working environment; (5) the offending conduct was both objectively and subjectively offensive; and (6) some basis for employer liability has been established.

Aponte-Rivera v. DHL Solutions (USA), Inc., ___ F.3d ___, No. 10-1655, 2011 WL 2027977, at *2 (1st Cir. May 25, 2011) (citing Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir. 2007)).

Assuming admissibility, the evidence was ample. The primary actors, in Tuli's account, were Day and another doctor--Dr. Dong Kim--who like Day is no longer at the Hospital. Kim's conduct, according to testimony set forth below that the jury could have accepted, was blatantly sexist and offensive; Day's, according to other evidence, sufficiently demeaning to a female surgeon as to be unlawful. Because chronology is pertinent, the principal episodes are set out in a time line:

2002-03: Day ignores Tuli at conferences by stating, "[L]et's ask the spine guys, Eric and Marc, what they think," and omitting her despite the fact that she is also a spine surgeon.

2004: At a graduation dinner and in front of a female resident, Day asks Tuli, "Can you get up on the table to dance so you could show them how to behave."

2004: In the summer, Tuli attends a bachelorette party for a coworker and sees a blow-up doll with a picture of her face attached to it.

2004: Day makes comments on different occasions: "You're just a little girl, you know, can you do that spine surgery?" "Oh,

-6-

girls can do spine surgery?"  "Are you not strong enough to use the hand instruments?"

2005:  In February or March 2005, with his arm on Tuli's back, Kim says, "Why don't we leave this place and go to the Elliott Hospital so I can give you an oral exam"; "I think you're really hot"; and "I imagine you naked."

2005:  Early in 2005, Day sits in on Tuli's teaching conference and disagrees with Tuli's lecture.  He does this more than once, and Tuli does not believe that he did so during male doctors' teaching conferences.

2005:  Residents, who are supervised by Day as residency director, ignore Tuli's pages, fail to assist her on rounds, and fail to show up for clinical duties.  In the summer, Tuli notices that she is given less-experienced, junior residents for her cases.

6/05: Tuli becomes aware of a Hospital-affiliated party planned with "strippers and cages and beer kegs."  Although it was supposed to celebrate the incoming chief residents, a new female chief resident was excluded.  Day approves of the party and of outside funding for it.

2005:  In September or October, Day and Tuli meet to clear the air, and Day says, "Our relationship is like that of lovers and you've cheated on me," with his hand on her arm; he also calls her "deranged."  When she attempts to shake his hand at the end of the meeting around 10:00 p.m., he gives her a prolonged hug.

11/05: A resident throws Tuli into the scrub sink and then the garbage.

12/06: Kim states, "Oh, could you wear one of those belly dancing outfits and show us a dance?"

2007:  Kim states that he would "like to have the opportunity to sexually harass" Tuli; Tuli

> observes him fondling a physician assistant at a department event.
>
> 5/07: Day looks in on Tuli's spine surgery and makes "some comment to the effect of whether [she] was able to do that case because [she] was a girl, are you sure you can do that, you're just a girl, something to that effect."
>
> 8/07: Day bars Tuli from spine oncology research saying that he had "a guy in mind" for the job.

Without specifying dates, Tuli also reported that Day had given her other prolonged hugs and had held her hand as they walked at work. She also testified that Day had questioned her authority in multiple teaching conferences and had made comments repeatedly about Tuli "being a little girl" and questioning whether she could do a "big operation"; the incidents noted above were particular examples of this recurrent behavior for which she could remember specific dates.

The "accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment." O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001). Tuli repeatedly complained about these acts, but the Hospital did nothing to prevent their repetition. That Tuli managed to get her work done despite the harassment does not prevent a jury from finding liability. Billings v. Town of Grafton, 515 F.3d 39, 51

(1st Cir. 2008).  The jury was entitled to find that a hostile workplace had been tolerated and that the Hospital was liable.[5]

The Hospital argues that Tuli "unreasonably failed" to seek corrective action, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998), because--though she reported the harassment to Whittemore--she never filed a formal complaint.  But Whittemore discouraged a formal complaint, conceding that Tuli's fear of retaliation was reasonable and known to him.  See Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35-36 (1st Cir. 2003).  Nor does this affirmative defense apply where, as here, the employer has taken a "'tangible employment action' . . . that would be actionable under Title VII independent of a hostile work environment."  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 21 n.3 (1st Cir. 2002) (quoting Ellerth, 524 U.S. at 761).

Both the federal and state provisions require that a charge be filed within 300 days of the alleged unlawful employment practice.  Title VII, 42 U.S.C. § 2000e-5(e)(1) (2006); Mass. Gen. Laws ch. 151B, § 5 (2011).  Tuli filed her complaint with the Massachusetts Commission Against Discrimination (MCAD) on November

---

[5]The Hospital cites cases holding offensive acts insufficient to show a hostile workplace, but they involve less egregious conduct. E.g., Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (one comment and gesture suggesting wish to have sexual relations); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 56 (1st Cir. 2000) (three age-related comments); Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990) (two minor incidents and one request to dance at Christmas party).

28, 2007.  The Hospital says that events listed in the time line set forth above that occurred prior to that date but outside of the 300-day window cannot be considered.

However, under Supreme Court precedent, a series of acts may comprise a single hostile environment claim, and

> [i]t does not matter, for purpose of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). This is the "classic example of a continuing violation." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009).

The sequence also satisfies Massachusetts' parallel analysis, which does not penalize victims of discrimination for reporting misconduct as it occurs and attempting to work with their employers to remedy the situation.  Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 939-41 (Mass. 2001).  Although in 2005 and 2006, prior to the 300-day window, Tuli was subject to "pinpricks," id. at 941, Day's presentation to the committee in October 2007 could be viewed as making clear that the situation was hopeless, triggering the clock for the sum of prior acts comprising the continuing violation.  Id. at 942.

-10-

The Hospital also complains that various evidence bearing on the hostile work environment claim was wrongly admitted at trial. Specifically, the Hospital contends that comments attributed to Day and Kim, as well as testimony from Eileen Hardy about a penis statue and cookie jar with women's underpants in Day's office and sexual drawings Day downloaded onto her Palm Pilot, were either inadmissible hearsay, irrelevant, unfairly prejudicial, or some combination of the three.

The claims of hearsay fail because the statements in question were not admitted for the truth of the matter asserted. If certain of the offensive conduct was unknown to Tuli at the time, it remained relevant for purposes of showing notice to the Hospital and toleration of a general climate of offensive remarks and displays. See Cummings v. Standard Register Co., 265 F.3d 56, 63-64 (1st Cir. 2001). Those of Kim's statements made off-site at a going-away party remained relevant to the hostile work environment claim, e.g., Parrish v. Sollecito, 249 F. Supp. 2d 342, 350-52 (S.D.N.Y. 2003), and Tuli reported Kim's conduct to Whittemore.

The Hospital claims that Tuli waived her rights when, in a June 16, 2006, letter to the Hospital, Tuli's counsel said that she appreciated efforts made by the Hospital to change behavior in her department and would hold her grievance in abeyance to allow Whittemore to address the issues. The letter explicitly states

-11-

that it is not a waiver, and a deferral in the hope of improvement does not foreclose a renewed complaint or lawsuit.  Cf. Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (formal release).

Finally, the Hospital sought jury instruction language to the effect that "mere offensive utterances," "offhand comments" and "isolated incidents" do not amount to discrimination, and it says now that the failure to give its language was error.  The district court gave a balanced instruction describing the considerations that bear on hostile work environment, noting that severity, frequency and offensiveness were all relevant.  It was not obliged to use the Hospital's language.

Retaliation.  The Hospital next claims the district court should have granted judgment as a matter of law on the retaliation claim.  Under Title VII, 42 U.S.C. § 2000e-3(a), it is

> an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Massachusetts has a counterpart provision.  Mass. Gen. Laws ch. 151B, § 4(4) (2011).

Tuli's position was that she had complained about Day and that the credentials committee action against her comprised retaliation.  The Hospital does not dispute that Tuli's complaints

-12-

were protected conduct, but it disputes that the evidence showed either of the two other requisites of a retaliation claim: that Tuli suffered "an adverse employment action" and that "a causal connection existed between the protected conduct and the adverse action." McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 309 (1st Cir. 1998) (citation omitted), cert. denied, 525 U.S. 1104 (1999).

Tuli provided sufficient evidence from which a jury could conclude that the consequences of the obligatory counseling ordered by the Hospital--invasion of privacy, potential stigma, and possible impact on employment and licensing elsewhere--"might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Obligatory counseling is not a typical adverse action but the impact here could be deemed sufficient by the jury if the action was prompted by a retaliatory motive.

The issue of causal connection is more complicated. A hospital has good reason to intervene--both to protect itself and to safeguard its patients--where a doctor is in need of treatment in order to provide competent care, and courts are likely to defer to an impartial assessment. Further, there is no suggestion that individuals on or involved with the committee other than Day

-13-

harbored any improper animus or acted with a retaliatory motive in voting to compel Tuli to seek and follow an evaluation.

But Day represented the Hospital as the head of his department in presenting the case against Tuli, cf. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1191 (2011), and Whittemore--who knew the background--re-presented it without qualifying information about Day. Day presented the case even though he had been the subject of adverse critiques by Tuli of his own performance as part of her official responsibilities and Day was the subject of her complaints about Day's own wrongful conduct toward her. It was for the jury to decide whether the committee was misled by Day in a way that altered the outcome.

Nor was the jury obliged to think the causal chain broken by the second round of review. Whittemore was himself relying in part on information from Day, and he did not tell the committee of the complaints that Tuli had made about Day; although some members were apparently aware of some of the background, it was not disclosed at the meeting. Two committee members testified that knowledge of the complaints against Day would have been "important information."

In making her retaliation claim, Tuli also argued that Day's negative report about her reflected in part her own investigation of cases in which she reported unfavorably on Day's

handling of patient cases.[6]  This, she argued, violated not only the federal and state statutes relating to discrimination but also Massachusetts' Health Care Whistleblower Act, Mass. Gen. Laws ch. 149, § 187(b)(3)-(4) (2011).  The latter protects those who report, inter alia, conduct of a health care facility reasonably believed to endanger public health.  Id.

The jury found for Tuli but awarded her only $1, presumably regarding the much larger award based on the other two statutes as compensating the central harm done by the committee's action.  The Hospital says that reporting of alleged errors by Day occurred too far in the past to contribute to the committee action; but the jury could view Day's presentation to the committee as reflecting multiple bases for hostility for purposes of both the retaliation and Whistleblower Act claims, including Tuli's earlier investigations.[7]

---

[6]In November 2005, Tuli was involved in investigating a case of Day's that was reported to the Board of Registration of Medicine, and she testified that he "called [her] a whistleblower, and he said that he was very angry at [her], and at one point he said he was so angry at [her] that he wanted to cut [her] legs off."  In 2006, Tuli investigated another case of Day's that was also reported to the Board.  Tuli also testified that between 2002 and 2007 Day suggested that she should step down from the QARM committee at least two or three times.

[7]In attacking the Whistleblower Act verdict, the Hospital invokes an affirmative defense contained in section 187(c)(1), but that provision expressly applies only to claims brought by plaintiffs under section 187(b)(1), whereas Tuli's claims meet the requirements of sections 187(b)(3) and (b)(4).

Tortious interference.  The hostile work environment and retaliation claims created liability only for the Hospital, but the jury also made three awards of damages against Day--one in the amount of $20,000 for tortious interference with advantageous relations.  Under Massachusetts law, the elements are a known advantageous relationship such as employment (undisputed here); deliberate interference, improper in motive or means; and resulting economic harm.  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 690 (Mass. 2005).

Day asserts that judgment as a matter of law should have been granted because his acts were not improper in motive or means.  Such an improper motive may be "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest."  King v. Driscoll, 638 N.E.2d 488, 494-95 (Mass. 1994).  Although Day says the motive must be entirely improper, Massachusetts' highest court says it is enough that malice was the "controlling factor" in any interference.  Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 716 (Mass. 2001).[8]

Here, Day says he was aiming only to give the committee a legitimate assessment of Tuli, who had numerous objectively

_____

[8]Accord Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21, 24 (Mass. 1981). Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 864 N.E.2d 518 (Mass. App. Ct. 2007), speaks of interference that was "entirely malevolent and unrelated to any legitimate corporate interest"; Day did not invoke Brewster in the district court and, assuming dubitante that there is any true conflict, the SJC's language controls.

-16-

troubling complaints against her; she points to reasons why he was independently hostile to her and to his overstatement of complaints against her and failure to disclose his biases. The jury was free to conclude that his motives were a mix of discriminatory animus, Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 77 (1st Cir. 2001), retaliatory animus, id., and "personal hostility or ill-will," Weber, 752 N.E.2d at 716.

Day says that the jury should have been instructed, as he requested, that personal dislike and sloppy business practices cannot be the bases for such a claim, citing Boothby v. Texon, Inc., 608 N.E.2d 1028, 1040 (Mass. 1993), and Weber, 752 N.E.2d at 716. This misreads Boothby, which said only that a reasonable measure undertaken on behalf of the company by a supervisor was not tainted merely because the supervisor also disliked the employee, and overreads Weber, 752 N.E.2d at 715-16, which did not say and could not mean that improper business behavior is inherently non-malicious and can never amount to wrongful interference.

Day also says that the evidence did not support a finding of economic harm or at least harm in the amount of $20,000. The harm relied on by Tuli in her tort claims against Day was a loss of of income. This, she alleged, resulted from Day's failure to give her a performance evaluation in 2007, received by every other doctor in the department and the trigger for an increase in salary,

as well as Day's diversion to his own practice of patient referrals in which she would otherwise have shared.

Although the jury did not explain its calculations, the raises in base salary received by the other doctors ranged from five to fifteen percent. A five percent raise on Tuli's $400,000 base salary is $20,000--the same figure awarded by the jury. The jury could rationally conclude on this evidence that Day's decision not to evaluate Tuli was part and parcel of his interference with her credentialing and cost her $20,000.

Defamation. Separately, the jury awarded Tuli $1 payable by Day for slander based on his statement to the committee that he had been told that between 20 and 30 nurses no longer wanted to work with Tuli in the operating room. Day says that this was merely non-actionable opinion, although the specific numbers are pretty plainly a factual assertion; alternatively, he says that it was privileged under state law unless reckless. E.g., Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 129 (Mass. 1984).

Day testified that the source of his information was a conversation with Nurse DiTullio and Dr. Aglio on a specific occasion, but DiTullio testified that she made no such statement during the conversation in question, nor had she ever heard anyone else make it. Day's statement bore directly on Tuli's re-credentialing and--in light of other evidence as to Day's

-18-

interactions with Tuli--could rationally be attributed by the jury to recklessness or worse.

Remittitur.  The Hospital asks us to overturn the trial court's denial of its motion for remittitur of a portion of the $1,000,000 (hostile work environment) and $600,000 (retaliation) in compensatory damages awarded by the jury.  Remittitur is called for where an award is "'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" Acevedo-Garcia v. Monroig, 351 F.3d 547, 566 (1st Cir. 2003) (quoting Correa v. Hosp. S.F., 69 F.3d 1184, 1197 (1st Cir. 1995), cert. denied, 517 U.S. 1136 (1996)).

Tuli testified about the emotional impact of the hostile work environment she encountered, the events she regarded as retaliation and ultimately the refusal to grant her an unconditional re-credentialing.  Tuli described her day-to-day existence after Day's presentation as "hell," with the looming threat of losing her credentials acting "like a gun to [her] head." She could not eat or sleep and lost ten pounds.  She experienced anxiety, anger, fear, and nervousness, which included physical manifestations of abdominal pain and nausea.

Tuli further testified that after years of hard work and striving, she felt "at the end of [her] career"--transformed from an up-and-coming neurosurgeon into someone who had been reduced to

-19-

a child-like state where she "couldn't function," "didn't open [her] mail for three months," and "couldn't pay her bills." Asked about the credentialing committee's adverse decision, she broke down on the witness stand, repeating the phrase "it was horrible." She explained:

> I worked so hard 20 years, everything I had, this is all my life was day in and day out . . . then to come to this fifteen minute presentation by Dr. Day, it changed my life, that's it, and I asked an institution to protect me, and they didn't. They didn't hear my voices, they didn't hear anybody else's voices who came to them, nobody's.

Tuli's testimony was corroborated in part by the testimony of her friend Evelyn Murphy.

There was no medical testimony, but such testimony although helpful is not required to show emotional harm, Koster v. Trans World Airlines, Inc., 181 F.3d 24, 35 (1st Cir.), cert. denied, 528 U.S. 1021 (1999), and it would not have been in Tuli's interest to claim a mental breakdown or permanent impairment. Damages for emotional harm under Title VII are limited to $300,000, 42 U.S.C. § 1981a(b)(3)(D) (2006), but under Massachusetts law the jury was free to exceed the federal dollar limit. 42 U.S.C. § 2000e-7 (2006); see Martini v. Fed. Nat'l Mortg. Ass'n, 178 F.3d 1336, 1350 (D.C. Cir. 1999), cert. dismissed, 528 U.S. 1147 (2000).

There is no basis for the Hospital's suggestion that we assume that the award was based solely on the federal claims. The federal and state counterparts for both sets of claims are fairly

similar; and certainly the Hospital points to no pertinent differences that would suggest that the jury likely awarded damages under only the federal version.

The total award of $1.6 million is higher than some awards where remittitur has been allowed, although several of the precedents cited to us involved cases with shorter periods of suffering in which the plaintiffs rapidly recovered their footing.[9] At the same time, it is on par with--and noticeably lower when intervening inflation is considered than--significant emotional injury awards that have been upheld under Massachusetts law. Sweeney v. Westvaco Co., 926 F.2d 29, 36 (1st Cir.), cert. denied, 502 U.S. 899 (1991); cf. Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 77-78 (1st Cir. 2007), cert. dismissed, 552 U.S. 1171 (2008).

Finally, we are here asked to review the district court's refusal to grant a remittitur. That decision is reviewed only for abuse of discretion. Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 80 (1st Cir. 2010). Conceivably the district court might have chosen to reduce the award; but, given the duration of Tuli's

---

[9]In Koster, the plaintiff moved on by opening up his own business and the court emphasized the lack of significant depression and incapacitation. 181 F.3d at 36. Similarly, in Labonte v. Hutchins & Wheeler, 678 N.E.2d 853 (Mass. 1997), the plaintiff's depression abated when he took a new job and started taking classes. Id. at 861.

asserted suffering and her powerful testimony, refusing to do so was not an abuse of discretion.

Unpreserved claims as to instructions. Very little discussion is required to dispose of Tuli's own claims of error, which are aimed at augmenting the damages awarded to her. She complains that the jury instructions did not provide for punitive damages against the Hospital or Day on the hostile work environment and retaliation claims and improperly restricted the jury to awarding nominal damages on the slander claim.

Tuli acknowledges that she did not preserve these claims at trial, saying instead that the asserted errors constitute "plain error." The familiar Olano standard governs plain error, United States v. Olano, 507 U.S. 725, 733-35 (1993), and its multiple conditions are applied "stringently" in civil cases. Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 5-6 (1st Cir. 2002), cert. denied, 540 U.S. 938 (2003); see also Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979) (exceptions only "in horrendous cases where a gross miscarriage of justice would occur").

Nothing like that is present in this case. The damages awarded were not ungenerous and Tuli was given a full opportunity to litigate her claims. It would be sheer conjecture to suppose that the jury would have awarded more had it been differently instructed.

-22-

Like Tuli, the Hospital attacks the jury instructions but, apart from one alleged error already dealt with, its objections too were not properly preserved. See Fed. R. Civ. P. 51(c)-(d). One related to the law governing pretext (an argument nearly identical to one we rejected in White v. N.H. Dep't of Corr., 221 F.3d 254, 264-65 (1st Cir. 2000)); another to the rather obvious relevance of potential legitimate reasons for the committee's action; a third (again obvious) to the relevance to causation of the time elapsed between a protected activity and an adverse employment decision; and the fourth another self-evident concern about time elapsed between incidents supporting a hostile work environment claim.

What has been said of Tuli's unpreserved objections applies equally to those of the Hospital. Even assuming error-- which we do not decide--there is no clear likelihood that the instructions would have altered any of the results nor any suggestion of a miscarriage of justice. Any post-judgment assessment can find arguable flaws in a complex set of instructions. This is not the rare occasion in which errors not preserved trigger a retrial.

Attorneys' fees. The district court awarded Tuli $1,352,525.94 in attorneys' fees for the proceedings in that court, 42 U.S.C. § 1988 (2006), just over 80 percent of what she had requested. The court supported its award with a detailed sixteen-

page order containing charts and explanations of the lodestar calculation and adjustments. The Hospital devotes two pages at the end of its brief attacking the award, almost all comprising generalities. Only two points require even brief mention.

The first is that the court allowed higher hourly rates than the Hospital's expert deemed appropriate, but the brief fails to acknowledge the evidence on which the court relied, including affidavits, comparison rates of similar firms, rates in similar reported cases, and the court's own experience. The second is that Tuli only prevailed on some of her claims; but Tuli amply exceeded the threshold for a fee award, Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791 (1989), and her recovery was handsome enough to lead to the Hospital's own demand for remittitur.

The second issue concerns the preliminary injunction which the Hospital says should never have been entered. We regard that injunction, to the extent it still matters, as properly entered. Much of the evidence pertinent to the committee's requirement was already in the record at the time of that injunction and nothing suggested that Tuli posed any imminent or serious threat to public health or safety. Cf. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1547-48 (Fed. Cir.), cert. denied, 516 U.S. 867 (1995).

Tuli is thus free to seek attorneys' fees incurred in defending that injunction on appeal and has already expressed an intention to seek attorneys' fees in connection with her defense of the present appeal from the final judgment.  This may be done in accordance with governing rules.  <u>See</u> 1st Cir. Local R. 39.1(b).  As to ordinary costs of this appeal, Fed. R. App. P. 39, each side will bear its own costs.  <u>Affirmed</u>.