NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0106n.06

**FILED**
Feb 19, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PEGGY J. BARNUM | ) | |
| | ) | |
| Plaintiff - Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE OHIO STATE UNIVERSITY MEDICAL CENTER; E. GORDON GEE, in his official capacity as President of The Ohio State University; STEVEN G. GABBE, in his official capacity as Chief Executive Officer of OSUMC; RONALD HARTER, in his individual and official capacity as Chair of the Anesthesia Department of OSUMC; STEPHEN PARISER, in his individual and official capacity as Chair of the Peer Review Committee of The Ohio State University; JOHN AND JANE DOES, 1-10, in their individual and official capacities as members of the Peer Review Committee | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants - Appellees | ) | |
| | ) | |

BEFORE:    DAUGHTREY, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge.    After Peggy Barnum exhibited unusual behavior while working as a Certified Registered Nurse Anesthetist, her superiors at The Ohio State University Medical Center required her to undergo a psychological evaluation. Barnum was eventually placed on paid sick leave pending her compliance with certain requirements, one of which was a more thorough psychiatric evaluation. Before Barnum met the requirements, she filed multiple complaints regarding OSUMC's privacy practices. When Barnum exhausted her paid leave, her

leave was converted to unpaid. She eventually fulfilled all of the requirements and was reinstated.

Barnum filed suit against the University, OSUMC, and her superiors, alleging among other claims that her employer retaliated against her for protected speech regarding privacy practices, and that her employer—regarding her as disabled—discriminated against her. The district court granted the defendants' motion for summary judgment, which Barnum now appeals. Barnum can show no connection between the defendants' actions and her protected speech. Furthermore, Barnum failed to show that the defendants' actions violated the Americans with Disabilities Act or the Rehabilitation Act. The district court court's grant of summary judgment was therefore proper.

Barnum worked as a Certified Registered Nurse Anesthetist (CRNA) at OSUMC, beginning in 2006. In 2011, her home life began to disintegrate, ending in divorce proceedings and the criminal prosecution of her daughter. Her personal issues began to surface during her work at OSUMC. According to Lisbeth Hill, another CRNA, Barnum was going through a hard time in the fall of 2011 and "without being certain of [Barnum's] exact words, she has said maybe I'd be better off I wasn't here, maybe I should just put a gun to my head, maybe I should just not be here." Hill told Barnum's supervisor, Chuck Martin, of her concern for Barnum, and Martin went directly to his supervisors, Dr. Ron Harter, the chair of the Anesthesia Department at OSUMC, and Steve Smith.

Dr. Fernando Arbona, an anesthesiologist at OSUMC East, also became concerned about Barnum when, over a two-to-four-week period, he received a "gradual escalation of [] undocumented reports" from surgeons, operating room nurses, anesthesiologists, and other CRNAs regarding Barnum's ability to concentrate on taking care of patients. Arbona notified

Harter after learning a surgeon had to ask Barnum at least twice to raise a patient's operating table because Barnum was not paying attention. When the surgeon eventually got Barnum's attention, she allegedly responded along the lines of "I'm not worth anything or I'm worthless, what good does it do or what difference does it make, why should I even be here, maybe I should do everybody a favor and not be around." Harter testified that he was particularly concerned about this incident because adjusting the height of an operating table is a routine task, and her response "calls into question not only her well-being but her ability to focus on providing care to the patient if something that's [a] relatively straightforward request is met with tears."

Barnum denies ever having a one-on-one conversation with Hill as Hill described, and opined that Hill overheard a conversation Barnum had with another CRNA. Barnum admitted to being unable to adjust the height of the operating table and becoming frustrated, and also remembered being tearful in the operating room.

In its opinion on the summary-judgment motions below, the district court laid out the facts of the case in a timeline:

> In **September to early October of 2011**, over a period of two to four weeks, several of Barnum's coworkers expressed concern about Barnum [described above]. In response, Dr. Arbona, an anesthesiologist at OSU East, called Dr. Harter and reported that Barnum may have "suicidal intention." (Arbona Dep. 43–83.) Barnum testified that she thought that her coworkers' concern for her would have been "sincere and genuine." (Barnum Dep. 105.)
>
> On **October 7, 2011**, Drs. Harter and [Stephen] Pariser[, a psychiatrist at OSUMC and Chair of the Peer Review Committee,] requested that Barnum report to the OSUMC emergency department ("ED") to be evaluated for suicide risk. Barnum told Drs. Harter and Pariser that she was concerned that her husband[, who was a case manager for OSU mental health,] may see treatment records. She was told that, although she was welcome to go elsewhere, her information would be more likely to cross her husband's desk if she went to a different hospital. She went to the OSUMC ED. (Barnum Dep. 73–74.) While Barnum was at the OSUMC ED, Dr. Pariser emailed Barnum stating that he would schedule a meeting with the [Peer Review Committee]. (Barnum Dep. 75–76.)

On **October 9, 2011**, Dr. Harter placed Barnum on "sick time" leave for one to two weeks, pending an evaluation. (Harter Dep. 45–46 (doc. 69).)

On **October 11, 2011**, in an email, Dr. [Pariser] scheduled the [Peer Review Committee] meeting for October 25, 2011 and told Barnum that the [Peer Review Committee] wanted her to see a psychiatrist. (Barnum Dep. 107, ex. 11.)

On **October 25, 2011**, Barnum met with the [Peer Review Committee], which recommended that Barnum remain off work until she secured a fitness for duty examination from a psychiatrist. Barnum testified that she initially resisted seeing a psychiatrist because she felt that the request amounted to "saying [she was] a nut job." She was also concerned that her husband would know any psychiatrist at OSUMC, and she did not want to see a psychiatrist outside OSUMC because she did not believe it would be covered by her health insurance policy. (Barnum Dep. 137–38.)

On **November 16, 2011**, Barnum saw a psychiatrist, Dr. Masterson.

On **November 22, 2011**, Barnum met with Dr. Thomas,[ another superior at OSUMC,] who indicated that a "fit-to-return-to-work" report from a psychiatrist Barnum selects would be adequate, as long as that individual had talked to Dr. Harter. (Barnum Dep. 205.)

Barnum testified that, following her November 16, 2011 meeting with a psychiatrist, "[she] spent months and a total of 21 communications with [her] divorce attorney saying where is the report from Dr. Masterson." (Barnum Dep. 207.)

On **February 1, 2012**, Barnum filed an internal complaint with OSUMC human resources, including allegations of privacy violations.

On **February 22, 2012**, Barnum delivered to OSUMC a report by Dr. Masterson stating that Barnum was and always had been fit for duty. (2d. Am. Compl. ¶ 23.) Dr. Masterson had not spoken with Dr. Harter.

In **March of 2012**, OSU requested Barnum to sign a release permitting OSU personnel to confer with Dr. Masterson. Barnum objected and requested that OSU either submit written questions to Dr. Masterson or confer with Dr. Masterson in a conference call attended by Barnum's attorney.

In **April of 2012**, Barnum filed a Charge of Discrimination with the [Ohio Civil Rights Commission].[1]

---

[1] Barnum also filed a complaint with the U.S. Department of Health and Human Services (HHS), Office for Civil Rights (OCR), alleging that OSUMC violated the Federal Standards for Privacy of Individually Identifiable Health Information, by failing to restrict Barnum's protected health information from being shared and used by her husband. On August 30, 2012, HHS OCR provided OSUMC materials explaining the Privacy Rule provisions and

On **June 21, 2012**, Barnum signed OSUMC's authorization form allowing OSUMC personnel to speak privately with Dr. Masterson.

On **July 10, 2012**, Drs. Thomas and Harter spoke with and provided background information to Dr. Masterson, who then issued an addendum to his report stating that his fitness-for-duty opinion had not changed.

On **July 31, 2012**, Barnum provided OSUMC with a second opinion from Dr. Spare, a psychiatrist, who opined that she was fit for duty.

On **August 22, 2012**, Barnum met with the [Peer Review Committee], which recommended her return to work. She was reinstated on **November 9, 2012**.

Although Barnum had accrued enough vacation time to take her through March 10, 2012, she declined to use it and was placed on unpaid medical leave on January 10, 2012, effective January 1, 2012, after her sick leave was exhausted.

After her return to work, Barnum filed suit against a number of defendants. She amended her complaint multiple times, added defendants, and eventually filed a second amended complaint. In this complaint, she alleged six claims: (1) First Amendment retaliation; (2)–(4) various alleged violations of equal protection and due process; (5) discrimination based solely on disability, perceived disability, and/or classification or misclassification as disabled, in violation of the Rehabilitation Act; and (6) discrimination based on disability or perceived disability in violation of the Americans with Disabilities Act. Barnum sought monetary damages on some of the claims and sought injunctive relief on others.

The district court dismissed a number of Barnum's claims. The court first trimmed away the money-damage portions of the First Amendment claim against the defendants in their official capacities. What remained of Barnum's First Amendment count were the individual-capacity

---

asked that OSUMC review these materials and to ensure that noncompliance does not occur in the future. It closed the case without further action.

claims against her superiors as well as her equitable claims against OSUMC and the defendants in their official capacities. Finding that Barnum's April 18, 2012 complaint with the U.S. Department of Health and Human Services Office for Civil Rights about OSUMC's privacy practices involved mixed questions of private and public concern, the district court denied dismissal of the First Amendment claims: "While the privacy of Barnum's own health information is of private concern to her, OSUMC's practices relating to individually identifiable health information, particularly practices that are alleged to violate HIPAA, are a matter of public concern." Thus, Barnum's First Amendment retaliation claim proceeded. The district court dismissed some additional claims not at issue on this appeal, but the district court refused to dismiss the disability claims, finding that Barnum alleged facts sufficient to constitute a plausible adverse employment action.

The district court subsequently granted the defendants' motion for summary judgment on the First Amendment claim. The district court analyzed four alleged retaliatory actions and the issue of qualified immunity. First, the court examined OSUMC's placing Barnum on leave after initial delays and whether that constituted a retaliatory action. The court dismissed this claim because the "[d]efendants undisputedly started the process of placing Barnum on leave before she first expressed any privacy concerns, and . . . there is no genuine question as to whether Barnum caused the initial delays." Second, the court dismissed Barnum's claim that the conversion of her leave from paid to unpaid was a retaliatory action, because the action was simply a matter of Barnum's exhausting her paid leave. Third, the district court found that there was "no evidence that Barnum's return-to-work 'pathway' was altered inappropriately" in retaliation for her protected speech and therefore dismissed it as a retaliation claim. Fourth, the court examined OSUMC's demanding that Barnum sign a release so that OSUMC personnel

could discuss Barnum's mental health with her psychiatrist. Barnum argued that this was an unnecessary requirement foisted upon her in retaliation for her speech. The court dismissed this retaliation claim, because Barnum failed to argue that this was an unnecessary requirement and she had previously objected to "at least one OSUMC doctor['s] speaking with" her psychiatrist, Dr. Masterson. Finally, because the court granted defendants' motion for summary judgment on each retaliation claim, the court found that a qualified immunity analysis was not necessary.

The court also granted the defendants' motion for summary judgment on Barnum's disability-discrimination claims. Because the analysis is similar under both the ADA and the Rehabilitation Act, the district court analyzed together the claims under those statutes. According to the court, OSUMC's requiring Barnum to undergo a psychiatric examination did not amount to regarding Barnum as disabled. The court, quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999), reasoned that employers are allowed to require a mental examination of an employee after the employee exhibits unusual behavior. Because Barnum did not respond to *Sullivan*'s applicability to her case, the district court granted defendants' summary judgment motion on the disability discrimination claims, finding that Barnum was not "regarded as" disabled.

Barnum appealed the summary judgment to this court, but only as to her First Amendment and disability-discrimination claims. On appeal of the First Amendment claim, Barnum argues that she expressed privacy concerns *before* OSUMC commenced the process of placing her on leave, that OSUMC's keeping her on leave after she filed her privacy complaints was retaliation, and that the district court erred in its determinations regarding her return-to-work pathway and the release requirement. Barnum also argues that *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619 (6th Cir. 2014), compels a result in her favor on the disability-discrimination

claim. None of these arguments has merit. Because Barnum cannot connect any of OSUMC's actions to her speech and because she was not regarded as disabled, the district court's grant of summary judgment was proper.

Barnum's initial "privacy concerns," although arising before the process of placing her on leave began, were not protected under the First Amendment and therefore fail to support her retaliation claim. The district court held that "[d]efendants undisputedly started the process of placing Barnum on leave before she first expressed any privacy concerns." Barnum argues that this is incorrect because she raised a privacy concern in the initial phone call she had with her superiors on October 7, 2011. In that phone call, Barnum expressed concerns about undergoing an initial psychiatric evaluation, because her husband might see the records. This was the extent of her "privacy concerns" expressed at that time. A basic element of a First Amendment retaliation claim is that the employee was speaking out on a matter of public concern. *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007) (citing *McMurphy v. City of Flushing*, 802 F.2d 191, 197 (6th Cir. 1987)). Barnum's October 7 concerns cannot be construed as regarding a matter of public concern. In contrast to her HHS complaint's being speech on mixed matters of public and private concern, Barnum's October 7 statements involved no issue other than her husband's potential access to her records. Her October 7 speech was thus not protected by the First Amendment, because "the point of the protection afforded public employees is to allow public employees a voice on issues actually affecting and interesting the community at large." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 966 (6th Cir. 2002). Because Barnum's only speech that received First Amendment protection—the filing of her HHS complaint—occurred *after* she was placed on leave, the initial act of placing her on

leave cannot be considered retaliation, and the district court properly granted the defendants summary judgment on this claim.

Moreover, Barnum has failed to put forth any evidence to support the connection between OSUMC's converting her leave to unpaid and her protected speech. As the district court stated, the conversion of Barnum's leave from paid to unpaid "appears to be a matter of Barnum['s] simply exhausting her paid [sick] leave." No evidence exists that links the conversion to Barnum's protected speech. Also, because the decision to convert Barnum's leave to unpaid was made in January 2012, three months before she filed her HHS complaint, that decision could not have been in response to her complaint. Because Barnum has not shown causation in this instance, the district court properly granted the defendants summary judgment on this claim.

Barnum's claim that OSUMC retaliated against her by delaying her return to work likewise lacks a causal connection. Barnum argues that the defendants impermissibly altered her return-to-work pathway by not returning her to work after she submitted multiple fitness-for-duty evaluations. However, she was informed of the requirements for reinstatement on November 22, 2011, when she met with Dr. Thomas. At that meeting, Dr. Thomas told Barnum that a fitness-for-duty report from a psychiatrist Barnum selected would be adequate for reinstatement, "so long as that individual had talked to Dr. Harter." Thus, OSUMC had placed a requirement on Barnum that she did not fulfill, and OSUMC therefore refused to reinstate her. Like her claim premised on OSUMC's converting Barnum to unpaid leave, no evidence exists that connects the delays in her return to work to her protected speech, and therefore no jury could reasonably find

for Barnum on this claim.[2]  The district court properly granted the defendants summary judgment on this claim as well.

With regard to Barnum's final First Amendment claim, she fails to show a causal connection between OSUMC's requiring her to sign a release and her protected speech.  The evidence suggests that OSUMC does not normally require releases to talk with psychiatrists in employee situations.  Barnum argues that because requiring a release is abnormal, there necessarily exists a genuine issue of material fact regarding whether OSUMC's requiring the release was retaliation.  Barnum, however, fails to show *any* connection between the release and her protected speech.  Although requiring a release was abnormal, Barnum admits that she objected to a previous doctor's talking to her psychiatrist.  In response to the objection, the defendants insisted that Barnum sign a release.  This explains why the defendants imposed an abnormal requirement, which Barnum argues cannot be explained.  The objection was based solely on Barnum's perceiving the doctor "as biased against her."  No evidence suggests that OSUMC required the release in response to Barnum's protected speech, and the court can make no reasonable factual inference to that effect.  Indeed, the decision to require Barnum to sign a release also occurred prior to Barnum's HHS complaint, which Barnum alleges is the protected speech that OSUMC was retaliating against.  The district court therefore properly granted the defendants summary judgment on this claim.[3]

Lastly, Barnum was not "regarded as" disabled under the ADA and RA, as the Sixth Circuit has interpreted that phrase.  In order to recover on a claim of discrimination under the

---

[2] Barnum argues that *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 42 (1st Cir. 2011), in which the First Circuit found required counseling sufficient to send the issue of retaliation to the jury, is analogous to her case.  In *Tuli*, however, the requirement to attend counseling came *after* the protected speech.  *Tuli*, 656 F.3d at 37–38.  This renders *Tuli* inapposite.

[3] Because Barnum cannot show a violation of any constitutionally protected right, we need not reach the qualified immunity issue.

ADA, a plaintiff must first show that: 1) she is an individual with a disability; 2) she is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and 3) she suffered an adverse employment action because of her disability. *Sullivan*, 197 F.3d at 810. Analyses of "regarded as" claims are identical under both statutes, except that under the RA, Barnum must show that she suffered an adverse employment action *solely* because of her disability. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc); *Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2003). Because the defendants were entitled to summary judgment on Barnum's claim under the ADA, they were likewise entitled to summary judgment on Barnum's RA claim.

Barnum argues that OSUMC regarded her as disabled and violated the ADA by requiring her to undergo medical examinations that were not job-related and consistent with business necessity. "An employer may request a medical examination when 'there [is] significant evidence that could cause a reasonable person to inquire as to whether [the] employee is still capable of performing [her] job.'" *Kroll*, 763 F.3d at 619 (alterations in original) (quoting *Sullivan*, 197 F.3d at 811). The burden is on the defendants in this case to show that the required mental-health evaluations were "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007).

Here, Harter and Pariser were informed by Arbona that there were numerous concerns expressed about Barnum's inability to concentrate and at least one instance where she could not perform a routine task. Harter was also informed that one of Barnum's concerned coworkers reported that Barnum had made a comment suggesting suicidal thoughts. These circumstances constitute significant evidence that would cause a reasonable person to inquire whether the employee is still capable of performing her job. *See Sullivan*, 197 F.3d at 808, 812–13. Thus,

the examinations were job-related and consistent with business necessity, and therefore no reasonable jury could conclude that the defendants regarded Barnum as disabled under the ADA and RA.

The district court's judgment is accordingly affirmed.